UNION GUARDIAN TRUST CO. *v.* EMERY.

1. BILLS AND NOTES—CERTIFICATES OF DEPOSIT.

   A certificate of deposit, payable on the return thereof properly indorsed, is, in legal effect, a promissory note payable on demand.

2. BANKS AND BANKING—TRUST COMPANIES—CERTIFICATES OF DEPOSIT.

   Prior to the financial institutions act, certificates of deposit could be issued by a trust company in the course of its business and as an incident thereto (Act No. 341, chap. 5, Pub. Acts 1937, as amended by Act No. 289, Pub. Acts 1939).

3. SAME—TRUST COMPANIES—CERTIFICATES OF DEPOSIT—CONSTRUCTIVE FRAUD.

   The fact that the issuance of a certificate of deposit by a trust company may have been *ultra vires* does not require a finding that such transaction was constructively fraudulent.

4. TRUSTS—CONSTRUCTIVE FRAUD—UNMERITED BENEFITS.

   Constructive fraud, a term applied to a great variety of transactions which equity regards as wrongful and to which it attaches the same or similar effects as those that follow actual fraud, has been evolved to designate what is essentially nothing more than the receipt and retention of unmerited benefits.

5. SAME—CONSTRUCTIVE TRUSTS—FRAUD.

   Constructive trusts arise by operation of law to prevent injustice; fraud, active or constructive, is their essential element, and they will arise whenever it becomes necessary to prevent a failure of justice.

6. SAME—EQUITY—CONSTRUCTIVE TRUSTS.

   Equity will construct a trust where a person gains something he should not be permitted to hold in equity and good conscience through actual fraud, abuse of confidence, or questionable means.

7. SAME—EX MALEFICIO.

A trust *ex maleficio* is a constructive trust arising out of some fraud, misconduct, or breach of faith on the part of persons to be charged as trustee, which renders it an equitable necessity that a trust should be implied.

8. SAME—CONSTRUCTIVE TRUSTS—EQUITY.

A constructive trust arises not from agreement but from operation of equities in order to satisfy demands of justice.

9. SAME—CONSTRUCTIVE, EXPRESS AND RESULTING TRUSTS. .

A constructive trust, unlike an express trust or resulting trust, is remedial in character.

10. SAME—CONSTRUCTIVE TRUSTS—EQUITY.

A court of equity, in decreeing a constructive trust, is bound by no unyielding formula as the equity of the transaction must shape the measure of relief.

11. SAME—CONSTRUCTIVE TRUSTS—UNJUST ENRICHMENT.

A constructive trust is imposed not because of the intention of the parties but because the person holding the title to the property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.

12. SAME—CONSTRUCTIVE TRUSTS—FRAUD—EQUITY.

Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it.

13. SAME—CONSTRUCTIVE TRUSTS—DEPOSITS—EQUITY.

A constructive trust will ordinarily be declared with respect to a deposit only where there is something in the attendant circumstances which renders it wrong, or contrary to law or good conscience, for the bank to accept the deposit from the depositor and treat the funds deposited as its own and as creating a mere debt on its part.

14. BANKS AND BANKING—TRUST COMPANY CERTIFICATES OF DEPOSIT—CONSTRUCTIVE TRUSTS—PREFERENCES.

A constructive trust, so as to accord a preference, will not be raised in favor of one to whom a trust company issued a certificate of deposit prior to the bank holiday, pursuant to a practice which had been followed by trust companies in this State for many years, which practice, though not specifically granted or barred by statute, was recognized by administrative officers and the courts.

15. SAME—GENERAL DEPOSITS.

A general deposit establishes relation of debtor and creditor between bank and depositor, is repayable on demand in whole or in part, consists of money which is mingled with that of other depositors in fund chargeable with payment of general deposits, possesses no trust quality, loses its special identity in the general commingling, and passes title to money so deposited to the bank.

16. SAME—SPECIAL DEPOSITS.

A special deposit establishes the relation of bailor and bailee between bank and depositor, is made for safekeeping, and is repayable in identical money, gives bank no right to handle or use the money, and does not pass title thereto to bank.

17. SAME—DEPOSIT OF TRUST MONEY.

Trust money, not deposited as special deposit in bank but in a general deposit, loses its identity as trust money, bank acquires title thereto and becomes debtor therefor.

18. SAME—DEPOSITS—INTENT—PRESUMPTIONS.

A deposit will not be regarded as special unless made for a special purpose, and with the intent it shall be held and used exclusively for that purpose and not mingled with the other funds in the bank; the presumption being that such deposit is general in absence of evidence to the contrary.

19. SAME—INTEREST—COMMINGLING OF FUNDS—PREFERENCES.

If depositary agrees to pay interest on sum deposited with it and nothing expressly provides that the funds shall be kept separately and the depositary becomes insolvent, the depositor would not be a preferred creditor.

20. TRUSTS—DEBTOR AND CREDITOR—INTENT—EVIDENCE.

In determining whether parties to a transaction intended to create a relation of trust or debt, it should be ascertained (1) whether there is an agreement to pay interest on the money paid; (2) what amount of money was paid; (3) how much time is to elapse before the payee is to be called upon to perform his agreement; (4) what the relative financial situation of the parties is; (5) what the relations between the parties are; (6) what their respective callings are; and (7) what the usage or custom is in such or similar transactions.

21. BANKS AND BANKING — SPECIAL DEPOSITS — COMMINGLING OF FUNDS.

> Deposits will be regarded as special only when made and intended for a special purpose by both depositor and bank, are set aside and used solely for that purpose, and are not mingled with other funds of bank.

22. SAME—TRUST COMPANY—GENERAL DEPOSITS—COMMINGLING OF FUNDS.

> Deposits made prior to bank holiday under an agreement with the trust company permitting it the use of the funds deposited and their commingling with other funds and used in its business constituted trust company and depositor debtor and creditor.

23. SAME—TRUST COMPANY—GENERAL DEPOSITS—INTEREST—PREFERENCE.

> Deposits made prior to bank holiday under agreements whereby trust company agreed to pay interest or issued interest-bearing certificates of deposit *held*, general and not entitled to preferential treatment when company became insolvent.

24. TRUSTS—DEPOSITARY NOT NECESSARILY A TRUSTEE.

> The fact that a trustee deposits funds does not make the depositary a trustee, even though the trustee-depositor is a trust company and is itself authorized to accept deposits, so as to entitle trust to preferential treatment of deposit made on its account.

25. SAME — TRANSFER OF FUNDS — PREFERENCES — DISCRETION OF TRUSTEE.

> Sums collected by trust company under a trust agreement relative to handling of vendors' interests in land contracts, sales and mortgages, whereby trustee was to pay taxes, collection fees, and trust administration expenses and then transfer balance to sinking fund to meet principal payments, which were transferred to sinking funds without taxes having been paid, were not funds entitled to a preferred status over general deposits after trustee's insolvency where such transfer did not involve an abuse of discretion on the part of the trustee handling such funds.

26. BANKS AND BANKING — TRUST COMPANY — CERTIFICATES OF DEPOSIT—INTEREST—KNOWLEDGE OF TRUST NATURE OF DEPOSIT.

> Deposit with trust company of a fund given a bondholders' committee, pursuant to an agreement with the owner of the fund

that it could be deposited with a bank or trust company in such a way as to draw interest and not be required to be segregated, created relation of debtor and creditor so far as trust company was concerned even though it knew that fund was set up for purpose of purchasing property at sale under foreclosure of mortgage, under which trust company was trustee for bondholders, or return to party who furnished the money and who was ultimately to receive the interest, and trust company issued an interest-bearing certificate of deposit for amount of such fund.

27. Same—Trusts—Commingling With Other Funds.
The fact that money deposited with a bank or trust company was to be used for a specific purpose does not make it a trust fund but it becomes such only if deposited with the understanding that it should be set apart for a particular purpose and not mingled with other money of the bank.

28. Same—Segregation of Deposit—Preferences.
There being no segregation of deposit with trust company made by special master in chancery who appointed trust company as his agent to distribute funds from such deposit to bondholders and no agreement with him that deposit was to be held in a separate or trust fund, the trust company was not under obligation to do so; hence such deposit did not create a trust fund and depositor was not entitled to preference when company became insolvent.

29. Same—Segregation of Deposits—Preference.
Trust company accounts for bond issues, testamentary trustee, and guardian, under which it collected and deposited funds and agreed to keep them entirely segregated from all of its other funds, were entitled to preference upon insolvency of company.

30. Same—Insolvency—Legal Reserve.
That bank's reserve may fall below amount which it is required by law to maintain is not in itself proof of its insolvency, but if bank officials are unable to secure funds to meet deficiency, it is insolvent, notwithstanding its assets are much greater than its liabilities, and it may be closed by State banking commissioner.

31. Same—Insolvency—Deposits—Trust Funds.
Before bank, whose reserve has fallen below legal limit, is declared insolvent, justifying treatment of general deposit as

trust fund, it must appear that the bank officers had no reasonable hope or expectation that their efforts to place bank on sound financial standing would prove successful, and that suspension of business was inevitable.

32. SAME—TRUST EX MALEFICIO—DEPOSITS RECEIVED DURING MERE INSOLVENCY.

Receipts of deposits by trust company while merely in an insolvent condition is not alone sufficient to entitle the depositor to rescission and establishment of a trust *ex maleficio,* where officers of company reasonably supposed in good faith that they could maintain its credit and surmount its difficulties, a distinction being drawn between irretrievable insolvency and mere insolvency, accompanied by reasonable hopes, expectations, and intentions of continuing in business and repaying depositors.

33. TRUSTS — CONSTRUCTIVE TRUST — FUND COMPOSED OF FRUITS OF FRAUD UPON NUMEROUS VICTIMS.

It is a fiction established by equity in order to work out justice to assume that, in the fluctuations of a fund made up partly of money obtained by fraud and partly of money belonging to a wrongdoer, the latter's purpose is to draw out his own rather than the other's money and that therefore the person defrauded can assert a lien on what remains, but such lien would not attach where the fund with which the wrongdoer is dealing is composed of the fruits of the frauds perpetrated upon a myriad of victims.

34. BANKS AND BANKING—INSOLVENCY—FRAUD—TRUSTS EX MALEFICIO—PREFERENCE.

Statement by officers of trust company that it would be necessary that it have the use of the funds left with it for investment in order to pay interest thereon, made at a time when the company was making no investments and was engaged principally in paying deposits on demand, *held,* not a false and fraudulent representation upon which a constructive trust could be predicated in order to obtain a preference over general creditors where officers reasonably supposed at such time that company could continue in business and was not hopelessly and irretrievably insolvent.

Appeal from Wayne; Miller (Guy A.), J. Submitted June 13, 1939. (Docket No. 68, Calendar No. 40,472.) Decided March 15, 1940. Rehearing denied June 18, 1940.

Separate bills by Union Guardian Trust Company, a Michigan corporation, as trustee, and more than 200 others against Harvey C. Emery, as liquidating trustee under the plan of reorganization of the Union Guardian Trust Company, to establish preferences. From decree rendered, defendant appeals and certain plaintiffs cross-appeal. Reversed in part and affirmed in part.

*Shaeffer & Dahling; Hill, Hamblen, Essery & Lewis; Slyfield, Hartman, Mercer & Reitz; Milburn & Semmes; Bulkley, Ledyard, Dickinson & Wright; Yerkes, Goddard & McClintock;* and *Beaumont, Smith & Harris,* for certain plaintiffs.

*Butzel, Levin & Winston,* for plaintiffs The Times Publishing Company and Union Guardian Trust Company, trustee.

*Prescott, Coulter & Baxter* (*Merrill E. Olsen,* of counsel), for plaintiff Union Guardian Trust Company, as trustee of George W. Martin trust.

*Shapero & Shapero,* for plaintiff Meier.

*Wiley, Streeter & Ford,* for plaintiff Olympia, Inc.

*Lewis & Watkins* and *Jason L. Honigman* (*Sempliner, Dewey, Stanton & Honigman* and *Milton J. Miller,* of counsel), for defendant.

McALLISTER, J. The above case is a consolidation of 203 cases on trial and review.

On proclamation by the governor of the so-called bank holiday, the Union Guardian Trust Company was closed as of February 11, 1933. After operation by a conservator, appointed by the State banking commissioner, the company was reorganized in April, 1934. By the plan of reorganization, all the

assets of the company were set aside in a fund designated as a depositors' and creditors' trust fund for liquidation by a trustee for the benefit of creditors, and provisions were made for the filing and allowance of claims, with the right of claimants to file suit to establish such claims as were disallowed. Plaintiffs were claimants who sought preference. Their claims were allowed as general claims, and they thereupon filed suit to establish preferences. The circuit court found constructive trusts resulting from certain of the deposits made and that such trust funds could be constructively traced. On other claims, it found that certain plaintiffs were *cestuis que trustent* under agreements of trust with the company, and on such claims preference was allowed. Claims of other plaintiffs were held to be trusts, but preference was denied because of inability to trace. From the decree, the trustee for creditors appeals; and certain plaintiffs file cross appeals.

The primary questions to be determined are whether certain trusts *ex maleficio* arose as a result of the conduct of the trust company and whether, in other instances, there was an actual trust relationship growing out of contract. It is contended by defendant trustee for creditors that the relations above mentioned were those of debtor and creditor, and that there were no trust relationships between the trust company and the other plaintiffs.

In order to arrive at its conclusion that certain claimants are entitled to a preference over general creditors, the trial court found that the conduct of the trust company in accepting the deposits in question and in issuing certificates of deposit was *ultra vires* and, therefore, constructively fraudulent; that thereby there arose a constructive trust impressed upon the general funds of the trust company in favor of the claimants.

Section 6164, 2 Comp. Laws 1897 (see 3 Comp. Laws 1929, § 12018 [Stat. Ann. § 23.248]), under which the trust company was organized, provides:

"Any corporation organized or existing under' this act shall have power in and by its corporate name to take, receive and hold, and repay, reconvey and dispose of any effects and property, both real and personal, which may be granted, committed, transferred or conveyed to it, with its consent, upon any terms."

In *Lamb* v. *Abendroth*, 268 Mich. 73, 79, the court commented upon the statute as follows:

"The conclusion reached renders it unnecessary to decide whether a trust company in this State is authorized and empowered by the statute to issue certificates of deposit. The attention of the legislature is respectfully called to the uncertainty existing relative thereto, and it may very properly amend the sections quoted (3 Comp. Laws 1929, §§ 12016, 12018, 12024) so as expressly to grant such power or deny its existence, as to it shall seem meet."

In an opinion by Attorney General Fellows, Report of Attorney General, Michigan 1913, p. 170, it was maintained that a trust company, under the statutes mentioned above, had the right to accept deposits and issue certificates of deposit therefor. In the opinion, it was stated that while the issuance of certificates of deposit was a function ordinarily performed by banks, it was not peculiar to banks alone, nor was it one of their primary functions. With regard to the right to issue certificates of deposit, it was held that such certificates are to be considered promissory notes.

The rule that a certificate of deposit, payable on the return thereof properly indorsed, is, in legal effect, a promissory note, payable on demand, and that the principles applicable to such notes should be

applied to certificates of deposit, has been repeatedly reaffirmed by this court. *Tripp* v. *Curtenius,* 36 Mich. 494 (24 Am. Rep. 610); *City of Lansing* v. *Wood,* 57 Mich. 201; *Beardsley* v. *Webber,* 104 Mich. 88; *Wolfe* v. *A. E. Kusterer & Co.,* 269 Mich. 424. It has been held that a trust company's right to issue certificates of deposit in the course of its business, and as an incident thereto, is not to be doubted. *Bank of Saginaw* v. *Title & Trust Co. of Western Pennsylvania,* 105 Fed. 491.

Under the statutes in effect at the time of the issuance of the certificates of deposit in the instant case, there was no apparent intention of the legislature to limit the authority of trust companies to receiving and holding property merely as trustee. As was further said in the opinion of the attorney general, *supra:*

"The practical construction which has been given to the statute in question should be given some weight. It is claimed that the act in question has been construed by those operating under it as permitting the receiving of moneys for safe keeping, and the issuance of certificates of deposits therefor, and that this practice has been followed without successful opposition or objection, from the passage of the act in 1889, until the present time. Where the language of the act is doubtful, the long continued practice under it is often permitted to turn the scale in favor of the construction evidenced by the practice under it, and this, we think, is an influence to be considered in determining that trust companies may receive deposits and issue evidence thereof."

It appears that the practice of a trust company in issuing certificates of deposit has been followed without opposition or question by the State and has been recognized as a proper function of such companies for the past 50 years. However, the former statutes with relation to trust companies have been repealed

since *Lamb* v. *Abendroth, supra,* and the transactions in this case, and superseded by Act No. 341, chap. 5, Pub. Acts 1937, which in turn was amended by Act No. 289, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 11897–191 *et seq.*), and uncertainty with respect thereto is not likely in the future.

But in any event it does not necessarily follow, although it be assumed that the receipt of deposits and issuance of certificates therefor was *ultra vires,* that such transactions were constructively fraudulent. Constructive fraud has been defined as a term applied to a great variety of transactions which equity regards as wrongful, to which it attaches the same or similar effects as those that follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of actual fraud. 2 Pomeroy, Equity Jurisprudence (4th Ed.), p. 1932, § 922. Constructive fraud has been evolved to designate what is, in its essence, nothing more than receipt and retention of unmerited benefits. *Hernig* v. *Harris,* 117 N. J. Eq. 146 (175 Atl. 169). Such trusts are raised to prevent injustice, and while the varieties of constructive trusts are infinite, they depend upon equitable principles and are imposed in those cases where it would be inequitable to do otherwise. In *Weir* v. *Union Trust Co.,* 188 Mich. 452, 463, it is said:

"Constructive trusts arise by operation of law. The following is found in 39 Cyc. p. 169:

" 'Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element. Actual fraud is not necessary, but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title. Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done. Such trusts are also known as trusts *ex maleficio* or *ex delicto,* or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.'

"Also, the following, in 15 Am. & Eng. Enc. Law (2d Ed.), p. 1123:

" 'Implied trusts, properly speaking, are such only as arise by operation of law as contradistinguished from such as arise by properly executed agreements of the parties. They are raised by law for the purpose of carrying out the presumed intention of the parties, or, without regard to such intention, for the purpose of asserting equitable rights of parties or frustrating fraud, and include the two classes of trusts known generally as resulting and constructive trusts.'

"As the author in the first quotation says, this form of trusts is practically without limit, and is raised by a court of equity whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice."

Equity will construct a trust where a person gains something he should not be permitted to hold in equity and good conscience through actual fraud, abuse of confidence, or questionable means. *Eliason* v. *Stephens,* 216 Iowa, 601 (246 N. W. 771). A trust *ex maleficio* is a constructive trust arising out of some fraud, misconduct, or breach of faith on the part of persons to be charged as trustee, which renders it an equitable necessity that a trust should be implied. *Yarborough* v. *Tolbert* (Tex. Civ. App.), 282 S. W. 302. A constructive trust arises not from agreement but from operation of equities in order to satisfy demands of justice. *Carleton Mining & Power Co.* v. *Railroad Co.,* 113 W. Va. 20 (166 S. E. 536); certiorari to United States supreme court denied, 289 U. S. 734 (53 Sup. Ct. 594).

"A constructive trust, as distinguished both from express and from implied trusts, may be defined as a trust which is raised by construction of equity, in order to satisfy the demands of justice and good conscience without reference to any presumed intention of the parties." Snell's Principles of Equity (19th Ed.), p. 122.

Unlike an express trust or a resulting trust, it is remedial in character. *Stephenson* v. *Golden,* 279 Mich. 710.

"A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." *Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 389 (122 N. E. 378, 381).

"This doctrine may not be invoked in equity as a matter of course. A constructive trust, said Dean Pound, 'is purely a remedial institution.' See 33 Harvard Law Review, pp. 420, 421. Such a trust is raised by a court of equity only to remedy the position of one having an equitable interest in the trust property." *State* v. *Phoenix Mutual Life Ins. Co.*, 114 W. Va. 109, 114 (170 S. E. 909, 91 A. L. R. 1482).

A constructive trust is imposed not because of the intention of the parties but because the person holding title to property would benefit by a wrong or would be unjustly enriched if he were permitted to keep the property. *Stephenson* v. *Golden, supra.*

"In giving relief by decrees for restitution against constructive trustees, or by decrees for specific performances against express trustees, equity has acted upon the highly moral principle that no one should, by the wrongful acquisition or retention of a title, unjustly enrich himself at the expense of another. * * * These applications of the doctrine of unjust enrichment are good illustrations of the highly moral quality of equity jurisdiction." Ames' Lectures on Legal History, pp. 445, 446.

"A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. A constructive trust, unlike an express trust or resulting trust, is remedial in character." 2 Restatement of the Law of Trusts, p. 1249.

"While the term 'constructive trust' has been broadly defined as a trust raised by construction of

law, or arising by operation of law, as distinguished from an express trust, in a more restricted sense and contradistinguished from a resulting trust it has been variously defined as a trust not created by any words, either expressly or impliedly evincing a direct intention to create a trust, but by the construction of equity in order to satisfy the demands of justice; one not arising by agreement or intention, but by operation of law; or one that arises when a person clothed with some fiduciary character, by fraud or otherwise gains some advantage to himself. By some of the authorities constructive trusts are defined to be trusts that arise from some equitable principle independent of the existence of fraud; however, by the classification followed by most authorities these trusts are denominated resulting trusts. Constructive trusts are also called trusts *ex maleficio,* trusts *ex delicto,* trusts *in invitum,* or involuntary trusts." 65 C. J. pp. 223–225.

This paragraph was quoted with approval in *Stephenson* v. *Golden,* 279 Mich. 710, 739.

In *Rollow* v. *Taylor* (syllabus), 104 Okla. 275 (231 Pac. 224), the court said:

"Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it."

In *Leonard* v. *Gage* (C. C. A.), 94 Fed. (2d) 19, 23, it is said:

"A constructive trust will ordinarily be declared with respect to a deposit only where there is something in the attendant circumstances which renders it wrong, or contrary to law or good conscience, for the bank to accept the deposit from the depositor and treat the funds deposited as its own and as creating a mere debt on its part."

In *Ulmer* v. *Fulton,* 129 Ohio St. 323, 342 (195 N. E. 557; 97 A. L. R. 1170), a bank and trust company had created trusts out of its own securities, and sold participation certificates therein. The company failed, and the certificate holders sought a preference. It was held that the trusts were void as *ultra vires* and as against public policy. The court said:

"Of course the holders of the participation certificates are not without relief. Actual knowledge of the invalidity of the 'trusts' is not fairly chargeable to them. To hold under the circumstances that their money is irretrievably gone would be inequitable and unconscionable. If the Commercial Savings Bank & Trust Company were a going, solvent institution, the participation certificate holders would be entitled to demand and receive the full amount paid for their certificates, the bank having been enriched by the receipt of their money; but the bank is insolvent, the purported trusts are invalid, and the rights of other persons are to be considered and protected. We do not see how the certificate holders can be placed in any better position than general creditors of the bank."

In *Leonard* v. *Gage, supra,* the State bank receiver deposited funds with a national bank, and the national bank pledged securities with the State bank to secure the deposits. The State bank relied upon the assurance of the comptroller's office that such pledge would be approved. The national bank failed, and the State bank thereafter sold the securities. Two years later the receivers for the national bank brought action against the State bank to recover the proceeds of the securities pledged on the ground that the pledge was *ultra vires.* The lower court found for the defendant, holding that the deposits constituted a constructive trust because the national bank had knowledge of the order requiring

State bank receivers to obtain security for their deposits. On appeal, the upper court said:

"We see nothing in the case to justify a finding that there were any circumstances of misconduct which would give rise to constructive trusts with respect to the deposits. This would be a matter for consideration with respect to the rights of the State bank receivers in the funds in the hands of the receivers of the national banks, not with respect to the rights of the latter in the proceeds of the pledged collateral; *but, in no aspect of the case, do we find any circumstances of misconduct or grounds for declaring a constructive trust with respect to the deposits.* The deposits were made as authorized upon the security specified in the order authorizing them. The relationship of debtor and creditor was created thereby just as the order contemplated. The security for the deposits failed, not because of the misconduct of any one, but because of lack of power in the bank to pledge the securities which the order of court had authorized the receivers to accept. The failure to obtain the security contemplated unquestionably resulted from a mistake of law, just as in the *Pottorff Case* (*Texas & P. R. Co.* v. *Pottorff,* 291 U. S. 245 [54 Sup. Ct. 416]) ; but, under the authority of that decision, such mistake does not give the one who has suffered from it any better status than that of a general creditor.

"The cases of *Tucker* v. *Newcomb* (C. C. A.), 67 Fed. (2d) 177, and *Cook* v. *Elliott* (C. C. A.), 73 Fed. (2d) 916, do not help appellees. In the first of these cases a constructive trust was declared with respect to funds belonging to an infant and deposited in a bank by its mother under circumstances amounting to a breach of legal duty of which the bank had knowledge. In the second, a deposit of county funds was made in a bank without the obtaining of proper security, in violation of a statute which required that such security be obtained as a con-

dition of the deposit. Here there was no improper deposit of funds by the receivers and no failure to obtain the pledge of securities which the order of court required. There is no reason, therefore, for holding that a trust relation arose with respect to the funds deposited instead of the debtor and creditor relation which the parties contemplated. *Cf. Blakey* v. *Brinson,* 286 U. S. 254 (52 Sup. Ct. 516; 82 A. L. R. 1288). The contracts under which the deposits were made, in so far as they created the relationship of debtor and creditor, were perfectly valid. Only the pledge of the securities exceeded the powers of the banks. If the entire contract under which the deposit was made be considered, as beyond the bank's powers, it results that the bank is liable for the funds received under an implied contract as for money had and received; but this liability is merely that of a general creditor. *Handelsman* v. *Chicago Fuel Co.,* 6 Fed. (2d) 163.''

*In re Title & Mortgage Guarantee Co. of Buffalo,* 246 App. Div. 435, 439 (284 N. Y. Supp. 335), was a case in which the court had approved a plan for the reorganization of the title and mortgage company. A proceeding was brought by the newly organized company, which took over the assets of the old company, to obtain a determination as to the rights of priority of payment, if any, as between various certificate holders in the new company. The New York personal property law* confined permissible investments of trust funds to the same kind of securities as those in which savings banks may invest deposits. The certificates purchased from the title company by the beneficiaries were not securities lawfully purchasable by savings banks. The question before the court was whether acceptance of the funds of the beneficiaries by the title company constituted the company a constructive trustee, and, if so, whether

---

* Cahill's Consol. Laws 1930, chap. 42, § 21.—REPORTER.

the beneficiaries were entitled to preference. The court said:

"The title company accepted the funds of appellants (beneficiaries) as a borrower and gave its certificates therefor with knowledge that the investments were contrary to statute. * * * All things considered, the title company was in fairness but a trusted custodian and representative of all the certificate holders to invest the funds as per agreement, to pay interest, to repay the investors, the lenders, in due time in full. In such circumstances, the trust funds are not earmarked, they cannot be followed or identified or any part of them segregated for full repayment to the appellants or those similarly situated upon any trust theory. Exact identification being impossible, it should at least appear—to justify a grant of priority—that the funds turned over to the title company by these fiduciaries are a part of the general mass of moneys still belonging to that company—that the moneys on hand for distribution include the funds paid in by appellants. * * * When the character of the business carried on by the title company and the disposition made of the moneys paid to it for certificates issued are considered it is difficult to see how—under any theory—identity of funds has been proved with sufficient accuracy to justify the interposition of equity, to hold the title company as a constructive trustee and grant the requested right to preference to the disadvantage of the other innocent creditors of the title company to whom, in large share, equitably belong the securities of the series D corporation (the new corporation)."

In *Texas & P. R. Co.* v. *Pottorff* (C. C. A.), 63 Fed. (2d) 1, a railroad company had deposited funds with a bank on condition that the bank pledge certain bonds with the railroad company as security for the deposits. The bank failed, and the railroad brought

action to enforce the contract against the bank. The bank actually had no power to pledge its assets for private deposits, and raised the defense of *ultra vires*. The railroad argue'd that, "having complied with its part of the agreement by leaving its funds on general deposit with the bank, the bank ought to be made to do what it promised, that is, devote the securities to making appellant whole." It was contended that though the bank's agreement was *ultra vires,* estoppel prevented it from so claiming; that the contract for depositing was single, the agreement for deposit being conditioned upon the agreement for security, and, that agreement failing, the bank held the funds not as debtor for a general depositor but as trustee for a special one. In deciding the case adversely to such claims, the court said:

"We cannot agree with either of these contentions. It is perfectly clear that, though the railway company was induced by the promise of security to deposit its funds, there are two agreements here, not one. One, that the bank should pay back to the railway upon demand the sums deposited with it as other general deposits were. This entirely valid contract the receiver has recognized, and has offered to pay the railway a dividend on account of it. The other is an agreement for security. This we have found to be invalid and without contractual force as beyond the corporate powers. This agreement plaintiff asks the aid of this court to enforce. * * *

"Appellant's claim that, if it cannot have its contract, money of the bank, to the extent of its deposits, should be now earmarked and held in trust for it, is equally without merit. In the first place, while it is certainly true that parties may by agreement give to deposits which would otherwise be general the special character of trust funds, an agreement definitely fixing the character of the deposit as general may not be disregarded, because, if the depositor had fully known the law and the facts, he

would have acted differently for his protection. *Fagan* v. *Whidden* (C. C. A.), 57 Fed. (2d) 631.

"Appellant's contract with the bank for the repayment of its deposits on demand was valid. These deposits it can have back, if the bank can pay. The contract for security was indeed invalid, but there is no basis at all here for declaring a trust. Here is a contract for depositing, which was valid, and one for security, which was invalid because of want of power in the bank, of which want of power appellant was as fully charged with knowledge as the bank was. The result is simply that, though the railway has the right to press its claim for its debt, it cannot do so for the security.

"It cannot be that a general depositor in a bank, who has made an agreement for security, may, because the security fails through an invalidity which in law it knew, find the bank converted into a trustee and himself a *cestui que trust* of the money of the bank to the extent of the amount of his general deposit."

From the foregoing, it is clear that there was no hard and fast rule for declaring a constructive trust. Such trusts do not arise unless there are circumstances which make it inequitable not to declare them, and unless the raising of such a trust be necessary to prevent a failure of justice. There are no circumstances in this case which would require the declaration of a constructive trust because of the receipt of deposits by the trust company and the issuance of certificates of deposit.

Among the appellees allowed preference by the circuit court were certain depositors who relied upon contracts with the trust company which referred to such relationship as a trust, but in which the trust company was given the right to commingle the funds so deposited with its own general funds and to use them in its business. Many of the contracts provided for the payment of stated interests to the de-

positors by the trust company. In other cases, while the deposits were made with contract provisions that the funds were to be made for the payment of certain obligations, nevertheless there. were provisions for the payment of interest by the trust company, and there was no understanding that such deposits were to be set aside solely for the purpose named and not mingled with other funds.

In *Owosso Masonic Temple Ass'n* v. *State Savings Bank,* 273 Mich. 682, 689–692, Mr. Justice Potter, speaking for the court, said:

"Deposits in banks are ordinarily divided into general and special deposits. A general deposit creates the relation of debtor and creditor between the bank and the depositor, and may be repaid on demand, in whole or in part, in current money. It consists of money which is mingled with the money of other depositors in a general fund chargeable with the payment of general deposits, possesses no trust quality, and loses its special identity in its general commingling with the funds of the bank. A special deposit of money is a deposit for safe keeping. It contemplates the return of the identical money deposited. The relation of bailor and bailee exists between the depositor and the bank. The bank has no right to handle or use the money constituting a special deposit. No relation of debtor and creditor exists between the depositor and the bank. In case of a general deposit, there is a depositor, not a bailor; a debtor, not a bailee; a creditor, not an owner. The title of the money constituting a special deposit does not pass to the bank. The title to the money constituting a general deposit does pass to the bank.

"Where one receives money as a trustee and it is not placed in a special deposit in the bank but in a general deposit so its identity is lost, it becomes the bank's money and the bank becomes debtor for the amount. *Neely* v. *Rood,* 54 Mich. 134 (52 Am. Rep. 802). * * *

"A deposit will not be regarded as special unless made for a special purpose and with the understanding it is to be set aside solely for that purpose and not mingled with the other funds of the bank. *Reichert* v. *American State Savings Bank,* 264 Mich. 366 (89 A. L. R. 1284); *Borgess Hospital* v. *Union Industrial Trust & Savings Bank,* 265 Mich. 156.

"In order to justify the designation of an account as a special deposit, its special purpose must be shown as well as an intention upon the part of both parties that it be held and used exclusively for such special purpose. The presumption with reference to a bank deposit is that it is general in the absence of evidence to the contrary. *Borgess Hospital* v. *Union Industrial Trust & Savings Bank, supra.*

"The defendant banks did not agree to treat the funds as special deposits, nor to set aside the moneys therein deposited for a special purpose and refrain from commingling them with the other funds of the bank. The contract of September 24, 1929, between the Masonic Temple Association and the trustees thereof provided:

" 'All funds coming into possession of said trustees and being the property of said Owosso Masonic Temple Association, shall be equally deposited at all times with the three banks of Owosso, Michigan, above named.

" 'Said trust committee shall also pay out on voucher signed by the president and secretary of the said Masonic Temple Association to holders or beneficiaries of said ownership bonds such amounts as shall become due thereon.'

"Neither of the banks was a party to any instrument providing these moneys were to be received as a special deposit. On the other hand, the contract contemplated the banks were to pay interest. If they did so, it was necessary for the banks to invest the moneys. They could not invest the moneys so deposited unless title thereto passed to them. There was a mutual understanding withdrawals could be made by the Masonic Temple Association as it saw fit just as if the accounts had not been specially named upon the books of the banks. Under the circumstances, the deposits in each of the banks were

general deposits, not entitled to preferential treatment.''

In *Dunlop Sand & Gravel Corp.* v. *Hospelhorn*, 172 Md. 279 (191 Atl. 701), it was held that where there was no manifestation of intent on the part of a depositor that the deposit should not be general, the presumption is that such deposit was general, and that presumption taken in connection with the promise of the depositary to pay interest is conclusive.

In *Doty* v. *Ghingher*, 166 Md. 426, 430 (171 Atl. 40, 42), the court, in holding that a deposit in a trust company was not a trust, said:

''There is here not only nothing in the agreement expressly providing that the funds shall be kept separately, but the fact that the bank was to pay interest on the deposit indicates that it was intended it should have the use of the money for its own purposes. The account is described in the agreement as a 'four per cent. interest account.' The only apparent purpose of marking it 'special' and tying it to the agreement was to protect the bank from the withdrawal of the deposit until the terms of the agreement should be fulfilled. The only designated purpose of the deposit was to protect the bank. It became the debtor of the depositor for the amount deposited, subject to mutual offsets. The account was virtually assigned as collateral. The depositor is entitled to an offset, but is not a preferred creditor as to any balance.''

In 1 Restatement of the Laws of Trusts, p. 42 *et seq.*, § 12 (g), (h), it is said:

''If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust

is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

"The intention of the parties will be ascertained by a consideration of their words and conduct in the light of all the circumstances. Among the circumstances which may be of importance in determining the intention of the parties are: (1) the presence or absence of an agreement to pay interest on the money paid; (2) the amount of money paid; (3) the time which is to elapse before the payee is to be called upon to perform his agreement; (4) the relative financial situation of the parties; (5) the relations between the parties; (6) their respective callings; (7) the usage or custom in such or similar transactions.

"If there is an understanding between the parties that the person to whom money is paid shall pay 'interest' thereon (at a fixed or at the current rate, and not merely such interest as the money, being invested, may earn) the relationship is practically always a debt and not a trust. Interest is paid for the use of the money, and if the payee pays interest he is, in the absence of a definite understanding to the contrary, entitled to use the money for his own purposes. It is theoretically possible, of course, for a trustee to pay 'interest' from his own funds, but in the absence of a clear agreement to that effect such an intention would not be found. * * *

"A general deposit of money in a commercial bank does not create a trust, but a relation of debtor and creditor, the depositor having in addition to his rights as creditor certain contract rights against the bank. This is true although the depositor is a trustee; thus if a trustee properly makes a general deposit of trust money in a commercial bank, the bank is a debtor to the trustee and the trustee holds the claim against the bank in trust for the beneficiary."

In 1 Morse on Banking (6th Ed.), § 186, p. 510, it is said:

"Wherever the bank has a right to mingle the funds deposited with its own, and treat them as a debt due from it, even though the money may be trust property given to the bank on condition that it would pay a certain sum to the *cestui* during life, the deposit is general. In the absence of evidence to show that it is the bank's duty, by agreement express or clearly implied, to keep the funds and their investment separate, it must be treated as a general deposit."

It might be said that a bank depositor "trusts" a bank to pay his deposit on demand; or that anyone who contracts with another trusts that such an agreement will be carried out. In casual speech one may speak, in such circumstances, of a trust which is reposed; but a trust in legal implication is susceptible to no such informality of language. What are sought to be established as trusts in this case are not in legal implication trusts any more than a promise is a trust reposed by the promisee in the promisor. *Austin* v. *Socony Vacuum Oil Co.,* 291 Mich. 513.

In *Borgess Hospital* v. *Union Industrial Trust & Savings Bank,* 265 Mich. 156, 161, Mr. Justice BUTZEL, speaking for the court, said:

"While there have been some fine-spun distinctions drawn in a number of decisions in other jurisdictions that give certain accounts a preferred position as special deposits, we believe that the better authority is to the effect that a deposit will not be regarded as special unless made for a special purpose *and with the understanding that it is to be set aside solely for that purpose and not mingled with other moneys of the bank.*"

Unless the deposit is segregated, there is no trust. It is our conclusion that in all cases where depositors entered into an agreement with the trust company,

permitting the use of funds deposited to be mingled by the depositary and used in its business, such deposits were general and the relationship was one of debtor and creditor. In cases where the so-called indentures or agreements provided for the payment of interest or the issuance of interest-bearing certificates of deposit by the trust company, such deposits were also general. The fact that the funds so deposited were referred to as trust funds, or that it was expressly provided that the trustee perform certain functions, did not result in making the deposit a trust fund. Neither does the fact that the depositor acted in the capacity of a trustee for such funds in making the deposit change the situation. The fact that a trustee deposits trust funds does not make the depositary a trustee. In *Stickle* v. *Guardian Trust Co.*, 133 Ohio St. 472, 485, 488 (14 N. E. [2d] 600), the trust company deposited funds of which it was executor and trustee in its *own* bank as a savings account. The company became insolvent, and the succeeding trustee sought a preference against the company. The court denied the preference, holding that against general depositors, equity would not grant a preference to such claim. The court said:

"In the instant case the trust company, as executor, made the deposit in the bank and left it there exactly the same as all other depositors who failed to withdraw their funds before liquidation. Having acted the same as other depositors of the bank who failed to withdraw their funds, as executor it cannot in good conscience or equity, nor can its successor, be preferred over other depositors. As heretofore observed, this is not merely an action for damages by a succeeding administrator against the former executor of an estate. It is an action for preference, and unless a clear legal right is established such claim cannot prevail. * * *

"In *Tucker* v. *New Hampshire Trust Co.*, 69 N. H. 187 (44 Atl. 927), it was held that where a banking corporation authorized to receive trust funds and act as trustee under judicial appointment deposits trust funds in its savings department, which afterwards became insolvent, a new trustee will not be a preferred depositor for the full amount of the trust funds, but will share equally with other depositors. The court in its opinion said: 'As to other depositors in the savings department, the plaintiff stands like any one of them and is entitled only to his share. The trust company was as much a trustee of the other depositors in the savings department as it was of the Adams fund, and they must share alike in a distribution of funds derived from the conversion of securities originally held as investments of that department.' "

With reference to the claimants before us, in many cases certain claims have been selected as representative of a class, as the terms of agreement of deposit or other considerations are similar.

In the case of The Times Publishing Company, the agreement of deposit, which is controlling, provided that the deposited funds could be mingled or used with other funds; that interest would be paid by the trust company; and that the liability would be the ordinary general liability of debtor to creditor. The trial court correctly found that no trust relation was created by the agreement between the parties.

In the George W. Martin claim, certificates of deposit of the trust company were deposited with a provision that such deposit would be invested and kept invested in such certificates of deposit, paying 4 per cent. interest.

In the Julia Meier case, the agreement of deposit provided for the payment of interest on daily cash balances at the current bank rate on savings accounts.

In the Norman Starr claim, there were provisions in the agreement of deposit for payment of interest and mingling of funds.

In the Peter Smith & Sons case, the trust company was authorized to receive principal and interest payments from the mortgagors for distribution to bondholders, with no provision for segregation of the funds thus received.

In the West End Land Company case, the trust company was empowered to collect payments from vendees on land contracts, to render accounts monthly, and to remit collections to the land company of all such moneys received in the preceding month. There was no stipulation that such funds so collected should be held in a special deposit, or segregated.

In the State Land Realty case, the agreement provided (article 3, par. 2, § 1) that from the collections from land contracts, sales, mortgages, or otherwise from said properties, there should first be paid "all charges of the trustee, including all salesmen's commissions upon sales hereafter made by the trustee, all taxes and assessments, collection fees and expenses of administration." The succeeding paragraph provided for establishing certain sinking funds and that the trustee—

"Shall allow interest on moneys comprised in the said sinking funds at the rate of 3 per cent. per annum, computed on even hundreds of dollars, and may use the said moneys for its own purposes in the same manner as a banker may use the moneys deposited by his customers; said interest shall be credited by the trustee to the said principal sinking fund as of January 31st and July 31st of each year.

"Third: The balance of collections not applied as provided in the foregoing paragraphs (1) and (2) shall be devoted by the trustee in its sole discretion and judgment as to purposes, as follows:

"A. Advances. The trustee may, from said balance of collections, advance sums for building operations on properties now or hereafter covered hereby, either directly or through the financing of independent builders, taking from them, if the trustee should deem desirable, first or second mortgages on improved property, or land contracts, as payment or security for such advances. * * *

"C. Application of balance. Any balance of receipts or collections not applied as provided aforesaid, may be transferred by the trustee to the principal sinking fund, in its sole discretion, to be used in the further purchase of bonds in the manner set forth in ensuing article 4 of this indenture."

It is the claim of appellee that of the amounts collected, that for taxes, under section 1 of the second paragraph of article 3 of the agreement, constitutes a trust fund, for the reason that the trust company was obligated to use such collections "first" for the payment of taxes. The trust company had transferred such funds to the sinking fund accounts. It had not paid the taxes. The sinking fund accounts were general accounts. The primary obligation of paying taxes was upon the vendees of the land contracts. The trustee may reasonably have expected that the vendees would pay such taxes to safeguard themselves and prevent their interest from being wiped out; or it may have concluded that the interests in the realty were not worth the tax claims and have, therefore, decided to conserve the funds for the bondholders. See *First National Bank of Ionia* v. *Michigan Trust Co.*, 105 Mich. 107, for a similar, but not identical, case. If it were a matter of discretion with the trust company as to whether the proceeds of collections should be turned over to the sinking funds, or a portion thereof used to pay taxes, it is admitted that there was no abuse of discretion on the part of the trust company. In any event, we

are of the opinion that under the circumstances of this case appellee is not entitled to preference over general claimants. There was no stipulation for special deposit of such collections. Under the circumstances of this case no constructive trust will be raised after insolvency to give a preferred status to such funds over general deposits.

It is pertinent here to quote the statement of the court in a similar situation in *Stickle* v. *Guardian Trust Co.*, 133 Ohio St. 472, 480 (14 N. E. [2d] 600):

"The real contest for preference here is not between plaintiff and the superintendent of banks, but between plaintiff and the general depositors. When a bank fails, it frequently disappears as a responsible party and the rights and equities of depositors must be considered in its liquidation."

In the Olympia, Inc., claim, it appears that the Detroit Olympia Building was under foreclosure. A bondholders' committee was formed and entered into an agreement with James Norris of Chicago, based upon the contingency of a purchase of the property on foreclosure by the bondholders' committee and reorganization of Olympia, Inc., the owner of the property. Norris was to advance to the committee $160,000, to be used in bidding upon the property upon foreclosure sale. In return for his advance he was to have certain interests upon the reorganization of the company if the bondholders' committee was successful in purchasing the property. In addition, in consideration of his advances, Norris was to receive the promissory note of the committee and a lien on the bonds in the hands of the depositary of the committee. If the funds advanced by Norris were not used to purchase the property, they were to be returned to him, and the committee's obligation cancelled. The committee agreed "to allow to Norris the same interest earned

upon funds advanced by Norris, as shall or may be allowed to the committee upon such funds by any bank or depositary with whom the committee shall deposit such funds.'' Norris gave his check for $40,000 to the bondholders' committee as the first payment of his advance, in compliance with the agreement. The committee deposited the check with the trust company and received an interest-bearing certificate of deposit in like amount. This payment by Norris constituted the first advance of an agreed total of $160,000, to be used for bidding. The fact that the trust company was trustee under the mortgage and receiver under foreclosure proceedings has no bearing whatever on any alleged trust relationship. The committee could have deposited the $40,-000 in any bank or trust company it desired. It was contemplated in the contract with Norris that the committee would receive interest on such a deposit; and the agreement was made pursuant to the plan of reorganization which provided that any sums paid ''may be held by any depositary subject to the order of the committee, or may be deposited in whole or in part with any bank, bankers, or trust company.'' It was, therefore, understood that the fund not only could be deposited with a trust company but also that it could be deposited under an agreement under which interest would be paid. The deposit of the fund by the bondholders' committee with the trust company resulted only in a depositor-creditor relationship, and the knowledge of the trust company of the purposes and objects of Norris and the committee are entirely immaterial.

''The fact that the money deposited was to be used for a specific purpose does not make it a trust fund. It becomes a trust fund only if deposited with the understanding that it should be set apart for a particular purpose and not mingled with other money

of the bank." *Reichert* v. *American State Savings Bank,* 264 Mich. 366, 369 (89 A. L. R. 1284).

In the claim of William S. Sayres, special master, a deposit was made, and the trust company was appointed by Mr. Sayres as agent to distribute to bondholders funds from such deposit, with instructions to hold any funds not paid out subject to his order. The deposit was accepted, and the duties were undertaken by the trust company without compensation. There was no segregation of the deposit and no agreement or understanding that such deposit was to be held in a separate or trust fund. No obligation being upon the trust company to segregate such fund or to hold it separate and apart, we are of the opinion that such deposit was not a trust fund and was not entitled to preference.

In all other claims, with certain exceptions hereinafter noted, there was either express authorization to mingle the funds of deposits, agreements to pay interest for the use of the funds, issuance of certificates of deposit by the trust company, authority to use the funds in the same manner that a banker may use money deposited by a customer, or deposits made without any conditions as to segregation of the funds. In certain cases the conditions of deposit were contradictory—referring to the deposits as trust funds, providing for separation of the account, and at the same time authorizing the use of the funds in a depositor-creditor relationship. Governed by the presumption that such deposits are general, in the absence of proof that they are special, we are of the opinion that none of the foregoing are entitled to preference as trust funds over the general claimants in these insolvency proceedings.

There are three cases in this cause in which preference was properly allowed. In the case of the trust company as trustee under the city of Detroit

Department of Street Railway's bond issues, the trust company agreed to collect rentals and to keep the money so collected separate from all other money or assets of the trust company. In this case as well as those of the trust company as trustee under the will of Alexander Folsom, deceased, and as guardian of Frederick L. Ams, it is conceded by defendant liquidating trustee that the funds so collected and deposited should have been kept entirely segregated from all other funds by the trust company; and with this view we agree. Our conclusion is that such trusts are entitled to preference, and with regard to these three cases, the decree of the circuit court is affirmed.

The trial court, however, further held that the acceptance of funds by the trust company from the cross-appellants while in an insolvent financial condition raised a trust *ex maleficio* with regard to such funds. In *Burgess* v. *Forshar*, 254 Mich. 531, 533, it was said:

"The acceptance of deposits by a bank is a representation of its solvency. Its customers have the right to expect that their checks will be honored when presented for payment. But, in order to do business, the bank must make loans of the moneys so deposited at an interest rate which will insure it a profit over and above its operating expenses. Applications for loans and the security offered therefor must be passed upon by its officials. There is a limitation on the amount of such loans by the reserve which the law requires to be maintained to meet withdrawals. That the reserve may fall below the requirement is not in itself proof of insolvency. The duty then devolves upon its officials to secure funds by the collection of the loans made, or from other sources, to meet the deficiency. If unable to do so, the bank is insolvent and may be closed by the State banking commissioner. But before such action is

taken, in order that a general deposit shall be treated as a trust fund, it must appear that the officers had no reasonable hope or expectation that their efforts to place the bank on a sound financial standing would prove successful. It must also appear to them that it is reasonably apparent that the bank will be unable to meet its obligations as they mature, and that suspension of its business is inevitable; in other words, that it is hopelessly insolvent.''

The trial court distinguished *Burgess* v. *Forshar* from the instant case on the ground that a different rule applied to a bank as distinguished from a trust company.

In *Newark Distributing Terminals Co.* v. *Hospelhorn,* 172 Md. 291, 302 (191 Atl. 707, 712), the rule similar to that in the *Burgess Case* was applied in rejecting a trust *ex maleficio* claim and preference against an insolvent trust company. The court said:

''But, in view of the definition of insolvency in *Coblentz* v. *State,* 164 Md. 558, 575 (166 Atl. 45, 88 A. L. R. 886), it cannot be said as a matter of fact that the deposit was fraudulent and collusive, for, while subsequent events proved that when these deposits were made the trustee probably was insolvent, it does not appear that its officers were wholly unreasonable in expecting to carry it on without interrupting the payment of its obligations, and to restore it to a sound condition. * * * It is reasonably apparent that the officers of the trust company did expect it to continue to operate and to meet accruing demands when these deposits were made. Its officers and clientele had shown sufficient faith in it in September, 1931, to raise a guaranty fund of over seven and a half million dollars, the period was one of widespread, blind, and unreasoning panic, when all financial institutions were under a crushing pressure from the efforts of frightened depositors to withdraw their funds, and they should not be lightly

convicted of fraud for trying to avoid accelerating or aggravating the common disaster by closing their doors, if they had a genuine and sincere hope of being able to continue in business. So that, even if it be assumed that the (trust company) trustee was guilty of a breach of trust in making the deposit, it cannot be said that the act of the (trust company as) depositary in receiving it was under the circumstances shown by the record in this case so unlawful or fraudulent that title to the fund did not pass to it."

See, also, *Stickle* v. *Guardian Trust Co., supra.*

In *Steele* v. *Commissioner of Banks,* 240 Mass. 394, (134 N. E. 401, 20 A. L. R. 1203), plaintiffs sought to recover the amount of deposits made by them in a trust company, on the ground that such deposits were accepted while the company was insolvent and that the insolvent condition was known to the officers of the company at the time of the receipt of the deposits, and that the company became a trustee *ex maleficio* for the benefit of such depositors. In passing upon the question the court said:

"A bank hopelessly insolvent receiving deposits from those who confide in its good reputation or in its representations is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay and is a fraudulent act. The contract of deposit may be rescinded by the depositor and the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry on its business and to recover sound financial standing. To warrant such rescission there must be the further fact that it is reason-

ably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature and will be obliged to suspend its ordinary operation. The facts must establish the conclusion that the trust company accepted the deposit knowing through its officers that it would not and could not pay the money when demanded by the depositor. * * *

"In the case at bar it appears that the trust company, while not complying with the requirements of the statute as to reserves, and while not keeping the assets in its savings department separate and distinct from its general assets, was yet continuing to meet its obligations as and when they arose. The exact state of its affairs or the precise extent of its insolvency is not disclosed on this record. It had been apparently in a somewhat shaky condition for several years and yet had been able to continue its business. The commissioner took possession of its assets and property under General Laws 1921, chap. 167, § 22. There is nothing to indicate that such action was anticipated by the officers or that they had any reason to expect that the institution might not continue for the next three or four years as it had during the past like period. Its deposits had been previously at a lower ebb than when closed by the commissioner, and had recovered. These suits in effect are claims against all the other creditors. This record discloses no equity in favor of these depositors against other depositors during this period of insolvency. In substance and effect the present plaintiffs are seeking a preference over other creditors which is not clearly established. A ratable distribution appears to be more likely to work out justice."

In *Brennan* v. *Tillinghast,* 120 C. C. A. 37 (201 Fed. 609), it was said:

"However, the mere fact that the bank is known to be insolvent at the time the deposit is received is

not in our opinion sufficient of itself, without more, to confer this right of rescission upon the depositor, and such right of rescission would not arise when the bank at the time of receiving the deposit, although embarrassed and insolvent, yet had reason to believe that by continuing in business it might retrieve its fortunes; the necessary condition upon which the right of rescission is predicated being that the deposit was received when the bank was hopelessly embarrassed and so circumstanced as to constitute its receipt of the deposit a fraud upon the depositor.''

A distinction is drawn between known irretrievable insolvency and mere insolvency, accompanied by reasonable hopes, expectations, and intentions of continuing in business and repaying depositors. *Fidelity & Deposit Co.* v. *Kelso State Bank* (C. C. A.), 287 Fed. 828. If the officers of a bank supposed that they could maintain its credit and surmount its difficulties, they were under no duty to disclose the affairs of the bank to its customers, and failure so to disclose could not be held to be fraud. *St. Louis & S. F. R. Co.* v. *Johnson,* 133 U. S. 566 (10 Sup. Ct. 390). See 44 Yale Law Journal, p. 512; 16 Minnesota Law Review, p. 432; 6 Indiana Law Journal, p. 338; 81 University of Pennsylvania Law Review, p. 390; note in 34 L. R. A. 532.

In *Yesner* v. *Commissioner of Banks,* 252 Mass. 358, 361 (148 N. E. 224), plaintiff sought to establish that deposits accepted by the bank when it admittedly was hopelessly insolvent raised a constructive trust. In passing upon this contention, the court said:

''It seems fairly inferable from all the facts set out in the master's report that, from one angle of approach, every deposit received by the trust company during a long period of time before the com-

missioner took possession of its property and business, was accepted fraudulently because it was in truth insolvent and not in a condition to pay the depositors in ordinary course. The devices adopted by it to secure the clearing of checks of its depositors show the straits to which it was put. Its entire gold reserve was used at one time to tide it along. In view of the exigencies constantly confronting the trust company in the last months of its doing business, it cannot be thought that any particular sum of money was kept in any special fund. It is a fiction established by equity in order to work out justice to assume that in the fluctuations of a fund made up partly of money obtained by fraud and partly of money belonging to a wrongdoer, the latter's purpose is to draw out his own rather than the other's money, and that therefore the person defrauded can assert a lien on what remains. It would be pressing that fiction to an absurd extent to follow it in the circumstances disclosed on this record. Every equity in favor of this plaintiff would probably be found to exist in favor of every other ordinary depositor in the trust company during the period covered by the master's investigations. The present plaintiff shows no equity in his favor superior to that of great numbers of other ordinary depositors, who have suffered through the unsound banking methods of the trust company. The reasoning and conclusion in *Cunningham* v. *Brown*, 265 U. S. 1, 12, 13 (44 Sup. Ct. 424), although relating to different facts and to proceedings in bankruptcy, are pertinent to the conditions revealed on the present record. Referring to the rule here invoked by the plaintiff, it there was said at page 13: 'The rule is useful to work out equity between a wrongdoer and a victim; but when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different.' Without saying that each of these words is apt to describe the case at bar, the principle

thus stated is relevant. It is controlling of the case at bar. * * *

"The trust company is hopelessly insolvent. Its assets are not sufficient to pay in full its depositors either in the savings department or in the commercial department. In substance and effect this is an attempt by one depositor to secure a preference over other creditors, and to get payment in full at the expense of other creditors. There is no equity which warrants such a preference in all the circumstances."

In the case before us, it appeared that while the trust company was in repeated difficulties for a considerable time prior to its closing, nevertheless it continued to pay out millions of dollars to depositors on demand; that it had secured, for the purpose of enabling it to continue in business, approximately $12,000,000 from the Reconstruction Finance Corporation in the last nine months of its operations; that it still had at the time of its closing commitments for securing an additional $2,500,000 to be conditioned on pledge of certain assets; that its holding company had undertaken negotiations with the Reconstruction Finance Corporation to secure a loan of $44,000,000 from which the trust company would benefit; that the holding company of the trust company had surrendered certificates of deposits to the amount of $7,500,000 in exchange for assets which were of doubtful value. Prior to the banking holiday, at which time the institution was closed, numerous conferences were held by the officials of the holding company and the trust company with the representatives of the Reconstruction Finance Corporation and the State banking commissioner in an effort to keep the institution from closing its doors. It could be said that the hopes of those concerned to secure sufficient cash by pledge of assets to keep the trust company

a going concern were unjustified. They, however, apparently in good faith, believed that there were reasonable prospects that the government would help them out. It was common knowledge that in a similar instance a loan exceeding the requirements of the trust company had been made shortly before the Reconstruction Finance Corporation; but this was not to happen again. And at the peak of a national crisis of economic peril and financial disillusionment, upon the unprecedented proclamation of a banking holiday by the governor of the State, the Union Guardian Trust Company closed its doors.

With regard to the claimed false and fraudulent misrepresentations of the trust company, it is said that the officers in their transactions with reference to the alleged indentures stated that in order to pay interest the trust company would be obliged to have the use of the funds for investment; whereas, the company was in such a financial condition that it was making no investments. The trial court found that such statements amounted to a representation that the company was making investments and that its affairs were in a going condition and were flourishing; that as a matter of fact the company was not making investments and was engaged principally in paying deposits on demand. We are of the opinion that the statement that the company was obliged to have the use of the deposit for investment in order to pay interest was not a false and fraudulent representation. The company, by its agreement, was bound to pay interest whether the funds were invested or not. The statement amounted to the generally accepted proposition that interest cannot be paid on a fund unless the borrowing party has the right to use the money. Under such circumstances the company was not obliged to invest the fund; it could pay interest out of its general funds. The fact

that the company used the funds in meeting the demands of depositors was not fraudulent if there was a reasonable supposition on its part that it could continue in business and that it was not hopelessly and irretrievably insolvent. No constructive trust can be predicated upon such statements.

On a review of the record, it does not appear that at the time the deposits in question were made the officers had no reasonable hope or expectation that their efforts to place the trust company on a sound financial basis would prove successful and that suspension of its business was inevitable. Under the authority of *Burgess* v. *Forshar, supra,* we are of the opinion that the receipt of deposits of the appellants does not entitle such depositors to the declaration of a constructive trust in order to secure a preference on their claims as against the general creditors of the trust company.

With regard to the foregoing, it appears that the city of Detroit, within 11 days of the closing of the trust company, deposited $2,562,096.10, $678,379.50 of which was deposited two days before the trust company closed. The cash on hand of the trust company at the date of closing was $1,091,182.93, as found by the trial court, with which finding we agree. Claims for preference, aggregating $1,573,634.34, were filed, and such preferences were allowed in the amount of $324,654.07. Within 11 days of the closing of this institution, the city of Detroit deposited nearly twice the amount of cash as the trust company had on hand at its date of closing. The claim of the city was allowed as a general claim. No appeal was taken, and it is urged by appellants that no consideration should be given to such matters inasmuch as the city of Detroit did not appeal. If it had not been for such cash on hand deposited by the city of Detroit, the trust company would have been obliged to close its doors, and there would have been

no cash whatever on hand to satisfy either general or preferred creditors.

Under no theory can it be said that there are any equities in this case on the part of claimants that entitle them to preference over general creditors and the raising of a constructive trust on their behalf.

In the matter of the claims of the trust company as trustee under the city of Detroit Department of Street Railway bond issues; as trustee in the Folsom estate; as guardian of Frederick L. Ams; and with regard to the claims in which preference was disallowed; the decree of the trial court is affirmed. In the remaining cases in which preference was allowed, the decree is vacated, and the bills of complaint of appellees are dismissed, with costs to defendant against such appellees.

SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred with McALLISTER, J.  WIEST, J., concurred in the result.  BUSHNELL, C. J., and BUTZEL, J., did not sit.