## DUNLOP SAND & GRAVEL CORPORATION *v.* JOHN D. HOSPELHORN

[No. 47, January Term, 1937.]

280

*Decided April 9th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*James Thomas,* with whom were *Knapp, Tucker & Thomas* on the brief, for the appellant.

*Alexander Armstrong* and *J. Purdon Wright,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On January 17th, 1930, the Dunlop Sand & Gravel Corporation "deposited or lodged" with the trust department of the Baltimore Trust Company $80,000, and accepted therefor a receipt which read as follows:

"Baltimore, Maryland, Jan. 17, 1930.

"This is to certify, that there has been this day depos-

ited or lodged with the Trust Department of the undersigned by the Dunlop Sand and Gravel Corporation the sum of $80,000.00 to be held by the undersigned subject to the terms of the aforegoing agreement, and the undersigned agrees to allow thereupon, or upon the unpaid balances thereof, interest at the rate of 3½% per annum.

"The Baltimore Trust Company

"By Peter E. Tome."

That fund was so deposited as a guaranty fund to insure compliance by the vendor with the terms of a sales contract under which the Dunlop Sand & Gravel Corporation undertook to sell to the Allied Sand & Gravel Corporation its sand and gravel plant, lands, property, and business in Chesterfield County, Virginia, and as a condition of the sale agreed that neither E. E. Titus nor John M. Dunlop, principal stockholders of the vendor, nor the vendor, would within the period of twenty years from the sale engage directly or indirectly in the sand and gravel business in the states of Delaware, Maryland, Virginia, West Virginia, North Carolina, or the District of Columbia.

That agreement was executed by the vendor, the vendee, and by Titus, Dunlop, Lemuel E. Bowery, and M. A. Finn, Jr., stockholders of the vendor, January 11th, 1930. After reciting the sale and the condition, it provided, first, that the parties agreed to perform the condition, second, that the vendor "deposit in or lodge with the aforesaid Baltimore Trust Company" $80,000 of the purchase price of the property, to be "held by the said The Baltimore Trust Company to secure the performance for the period of four years next ensuing" from the date of the agreement, and that, if no default occurred in the meantime in the performance of noncompetitive covenants, the said sum of money should be repaid to the vendor in four yearly installments of $20,000 each, and, third, that in the event that the vendor and both Dunlop and Titus within that period engaged in the sand and gravel business in the specific territory, so much or all of "the said sum so deposited," as remained in the possession

of the depositary undistributed, should be paid to the vendee as liquidated damages, but that, if Titus alone, or Dunlop alone, engaged within that period and in that territory in that business, and "the other" and the vendor kept the covenant, one-half of such balance should be paid to the vendee as liquidated damages. It further provided that in the absence of any breach of the covenant the vendor should receive interest at the rate of six per cent. on the amount so deposited with the trust company, on unpaid balances, "irrespective of the rate of interest which the said Trust Company may allow upon such deposit or the balance remaining thereof, and that at the time of the annual payments of the principal and interest as hereinabove provided, it will pay to the said Dunlop Sand & Gravel Corporation such amounts as may be necessary to make up the difference between the interest paid or allowed by the said The Baltimore Trust Company and interest at the rate of six per cent. per annum as aforesaid."

The fund was deposited upon the terms stated in the receipt, there was no breach of the covenants, the Trust Company remitted on January 14th, 1931, and January 11th, 1932, the installments of $20,000 payable respectively one and two years from the date of the agreement, and, by agreement of all the parties, made on July 21st, 1932, an accelerated payment of $17,200, and on January 14th, 1933, it made a further payment of $11,400, and "the accrued income on said fund," due at the dates on which respectively these several payments were made.

On February 24th, 1933, the Governor of Maryland proclaimed a bank holiday, which became effective on the following day and by successive proclamations was extended to March 4th, 1933, when the Emergency Banking Act, chapter 46 of the Acts of 1933, became effective, and on February 25th, 1933, when the holiday first became effective, there remained of the whole sum of $80,000 unpaid $11,400.

Under and by virtue of the provisions of the Emergency Banking Act the bank commissioner of the State

of Maryland assumed custody, control, and management of all state banking institutions, including the Baltimore Trust Company, and that custody in respect to it continued until January 5th, 1935, when, in a proceeding instituted against it by the State, John D. Hospelhorn was appointed a receiver for it. While the Trust Company was under the control of the bank commissioner, dividends to general creditors aggregating thirty-five per cent. were declared, and an additional dividend of five per cent. to creditors to whom it was indebted in a fiduciary capacity. These dividends on the balance held by the Trust Company under the agreement aggregated $4,080.37, which were remitted to the Dunlop Sand & Gravel Corporation under a stipulation that the acceptance of these dividends would not prejudice any right which it might have to preference or priority in the distribution of the assets of the Trust Company, or any right it might have to recapture the fund.

From the early summer of 1931, notwithstanding efforts by the Clearing House Association of the City of Baltimore, and subscriptions to a guaranty fund of $7,755,400 to restore the confidence of its depositors, there was a heavy and accelerating shrinkage in the deposits of the Trust Company, until on February 24th, 1933, they had declined from $80,462,000 on July 1st, 1931, to $37,292.62. Accompanying that movement losses aggregating $8,574,224.48 were charged off, and the ratio of its liquid assets to its obligations steadily fell. Of the funds on deposit, at the close of business on February 24th, 1933, with the Trust Company, $990,391.47 were classified as "Trust Deposits," and at that time it had on hand, or on deposit on demand with other banks, cash aggregating $5,252,785.56, of which $1,224,291.06 was in its own vaults. The aggregate of all claims for unpaid balances against the "Trust Deposits" was $986,784.67, and the total claims of all depositors aggregate $37,-292,794.62.

In that situation, the Dunlop Sand & Gravel Corporation filed in the receivership proceeding a petition setting

out the facts recited above, and praying the court to determine what rights it had to preference, priority, or recapture, against the assets of the Trust Company. While the form of the prayers is equivocal, it is manifest that the real relief sought was to have the court decide that the petitioner was entitled to have its claim paid in full out of the assets of the corporate trustee, before anything was paid from such assets on account of the claims of general creditors. The trial court assumed that that was the purpose of the petition, and the case was argued in this court on that theory.

The alleged basis for that relief was that the Baltimore Trust Company held the fund as a trustee, and that, under chapter 546 of the Acts of 1933, the claim of the Dunlop Sand & Gravel Corporation, the beneficiary of the trust, was entitled to a "preference" over general creditors in any distribution of the assets of the Trust Company. The receiver demurred to the petition, the court sustained the demurrer and dismissed the petition, and from that order the petitioner took the appeal noted in No. 47 of the January Term of this court.

The first question submitted by the appeal is whether the Baltimore Trust Company held the fund, "deposited or lodged" with it, as a trustee, or whether it was indebted to the petitioner for its repayment as a mere business debt.

It appears from the receipt that the Trust Company agreed "to allow" upon unpaid balances of the fund interest at the rate of 3½ per cent., and that the agreement between the Dunlop Sand & Gravel Corporation and the Allied Sand and Gravel Corporation assumed that interest would be "paid or allowed" by the Trust Company on the money so "lodged or deposited" with it. It also appears in the agreement that the Dunlop Company was "to receive interest upon the amount so deposited by it with" the Trust Company at the rate of six per cent. per annum, irrespective of the interest allowed by the Trust Company. In construing those provisions of the agreement, weight and consideration must be given to

the fact that the Trust Company was not only authorized to conduct, but did conduct, not only a trust business, but also a banking business, and that its trust business was a very small part of its whole business. It also appears from both the agreement and the trust that the fund was not to be transferred to the Trust Company, as to a trustee, but rather to it as a bank. It is true that in describing the transaction the parties spoke of it as depositing in or lodging with the trust company the fund of $80,000, but that phrase is used in the agreement as equivalent to "deposit," for in the same paragraph the agreement speaks of "the amount so deposited," the allowance of interest on "such deposit," after having in a preceding paragraph provided that the Dunlop Company should "deposit in or lodge with" the Trust Company that fund. The receipt was not signed by the Trust Company as trustee, but merely by its corporate name, through an employee of its trust department, Peter E. Tome, although negotiations in connection with the transaction were with the trust department of the Trust Company. It also appears that in accepting the fund the Trust Company undertook to disburse it under circumstances which might involve the exercise of discretion, and in that connection to perform duties fiduciary in their nature.

Nowhere, either in the agreement or the receipt, is there any mention of a trust or of a trustee, so that, if it was the intention of the parties to create a trust, it can only be inferred from the nature of the duties imposed upon the depositary, and the circumstances attending the transaction. But the duties imposed upon the depositary were merely to see that the deposit was paid to the depositor if there was no breach of the covenant against competition, or to the vendee if there was such a breach, and to require before making any such payment to the vendee clear and satisfactory evidence of a breach of the covenant. While those duties did involve the exercise of discretion, and while the duty of seeing that the deposit was paid to the right person was in a sense fiduciary,

those incidents of the deposit, without more, were not sufficient to characterize the relation between the depositary and those who might become entitled to receive the deposit as that of trustee and *cestuis que trust*, for they are often found in other relationships, such, for instance, as that of bailor and bailee, or that of debtor and creditor. And, when the circumstances attending the transaction are examined, they are found to comport more with the relation of debtor and creditor than with that of trustee and *cestuis que trust*. A circumstance of vital importance was that the depositary was to pay interest on the deposit. Interest is ordinarily regarded as a price paid for the use of money, and, unless a contrary intent is manifested, it is implicit in a contract to pay interest that the promisor shall have the right to use the money on which the interest is paid as his own, in order to earn the money with which to pay it, subject only to the obligation of repaying it when called upon, in accordance with the terms of the deposit. The right to so use the fund necessarily means that title to the fund passes to the depositary, that the fund deposited becomes indistinguishably fused with the general funds of the depositary, and that the relation between the depositary and persons entitled to demand the amount of the deposit from the depositary, that of debtor and creditor.

That conclusion is not affected by the fact that the depositary was authorized to act both as a trustee and as a bank, if the deposit was with it as a bank, not as trustee, but merely in its general corporate capacity. That it was so made must be inferred from the terms of the agreement and the receipt. The agreement described and referred to the Trust Company not as a trustee, but merely as a depositary, and the receipt was signed by it merely in its general corporate capacity. The fact that the transaction was actually handled by its trust department was wholly fortuitous and without significance, a mere administrative detail over which the depositor had no control, which could not affect the relations created by the written instruments to which reference has been made.

In the *Restatement of the Law of Trusts, Am. Law Inst.*, sec. 5 *et seq.*, after pointing out that certain relationships, such as those of bailor and bailee, section 5, executors and administrators, section 6, guardian and ward, section 7, principal and agent, section 8, mortgagor and mortgagee, section 9, the holder of property subject to an equitable charge and the equitable encumbrancer, section 10, are not trusts, it is pointed out in section 12 that a "debt is not a trust." In elaborating that principle it is said, in comment *g* to that section, that:

"If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

"The intention of the parties will be ascertained by a consideration of their words and conduct in the light of all the circumstances. Among the circumstances which may be of importance in determining the intention of the parties are: (1) the presence or absence of an agreement to pay interest on the money paid; (2) the amount of money paid; (3) the time which is to elapse before the payee is to be called upon to perform this agreement; (4) the relative financial situation of the parties; (6) their respective callings; (7) the usage or custom in such or similar transactions.

"If there is an understanding between the parties that the person to whom money is paid shall pay 'interest' thereon (at a fixed or at the current rate, and not merely such interest as the money, being invested, may earn) the relationship is practically always a debt and not a trust. Interest is paid for the use of the money, and if the payee pays interest he is, in the absence of a definite understanding to the contrary, entitled to use the money for his own purposes. It is theoretically possible, of course,

for a trustee to pay 'interest' from his own funds, but in the absence of a clear agreement to that effect such an intention would not be found."

In comment *h* it is said: "A general deposit of money in a commercial bank does not create a trust, but a relation of debtor and creditor, the depositor having in addition to his rights as creditor certain contract rights against the bank. This is true although the depositor is a trustee; thus, if a trustee properly makes a general deposit of trust money in a commercial bank, the bank is a debtor to the trustee and the trustee holds the claim against the bank in trust for the beneficiary." Bank deposits may be "special," where the thing deposited is identical with what is to be returned, *Morse on Banking,* sec. 183, "specific" where money is deposited for application to a specified purpose, *Id.*, sec. 185, in both of which cases title remains in the depositor, *Id.*, or "general," where title passes to the bank and the fund deposited may be mingled with the general funds of the bank, and dealt with as its own, *Id.*, sec. 186. Deposits are presumed to be general unless expressly made special or specific, *Id.*, and "Wherever the bank has a right to mingle the funds deposited with its own and treat them as a debt due from it, even though the money may be trust property given to the bank on condition that it would pay a certain sum to the *cestui* during life, the deposit is general. In the absence of evidence to show that it is the bank's duty, by agreement express or clearly implied, to keep the funds and their investment separate, it must be treated as a general deposit." *Id.*

In this case, as in *Doty v. Ghingher*, 166 Md. 426, 430, 171 A. 40, there is no manifestation of any intent of the depositor that the deposit should not be general; in the absence of evidence of any such manifestation, the presumption is that it was general, and that presumption, taken in connection with the promise of the depositary to pay interest, is in this case, as it was in that, conclusive. But the appellant suggests that a promise to "allow" interest is not a promise to "pay" interest. The word

"allow" has no rigid or precise meaning, but its import varies widely according to the circumstances or the context in connection with which it is used. 2 *C. J.* 1154; 3 *C. J. Secundum,* page 888; 1 *Words and Phrases,* First Series, 344; *Oxford Dictionary.* One meaning given to it in the *Oxford Dictionary* is to "bestow, assign," "to assign to any one as his right or due; to accord." It may under some circumstances imply a discretion, in others an unqualified and definite promise to do some specified thing. As used in the receipt, it can have but one meaning, to pay. If it had been intended to leave the payment of interest in the discretion of the Trust Company, so that it might pay it or not, as it elected, there was obviously no necessity to fix the rate of interest. So that, when the Trust Company agreed to "allow" interest at the rate of three and one-half per cent. per annum, it can only have meant that it agreed to pay interest at that rate. The word "allow" was carried over to the receipt from the agreement, where it was used in connection with the fixation of the rate, rather than the payment of interest at the rate fixed, and in the receipt that use of it persists, for it is there used in connection with the fixation of the rate. But there, as a necessary implication, it also imported a promise to pay the rate fixed. The fixation of the rate implied that the depositor was entitled to receive from the depositary interest at that rate, and, if it was entitled to receive it, the depositary was obliged to pay it.

It follows that the depositary did not hold the fund claimed by the appellant as a trustee, but as a debtor, and that the appellant is not the beneficiary of any trust impressed upon the fund, but merely a general creditor of the Trust Company. In view of that conclusion, it becomes unnecessary to discuss the other points argued, since they relate only to the statutory rights of the beneficiaries of insolvent corporate trustees. The order appealed from must therefore be affirmed.

*Order affirmed, with costs.*