LEVIN, SUBSTITUTE RECEIVER OF MONUMENTAL CITY SAVINGS & LOAN ASSOCIATION, INC., ET AL. *v.* SECURITY FINANCIAL INSURANCE CORPORATION, ET AL.

[No. 347, September Term, 1966.]

*Decided June 1, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Irving F. Cohn,* with whom were *Eugene A. Alexander, III* and *Julius A. Victor, Jr.* on the brief, for appellants.

714

*Peter Parker,* with whom was *William D. MacMillan* on the brief, for appellee John H. Coppage, Receiver of Security Financial Insurance Corporation; *Thomas H. Hedrick,* with whom was *Charles W. Woodward, Jr.* on the brief, for appellee Charles W. Woodward, Jr., Successor Receiver of Military Service Savings and Loan Association; no brief filed for appellee First Guarantee Savings and Loan Association, Inc.

BARNES, J., delivered the opinion of the Court.

This case calls upon us to determine whether certain funds in the hands of the receiver of an insolvent insurer, Security Financial Insurance Corporation (SFIC), are subject to the claims of all receivers representing the creditors of insolvent savings and loan associations or are required to be repaid to the receivers of those associations which originally had transferred the funds to the insurance company. SFIC insured savings share accounts with all of the savings and loan associations involved.

Three distinct parties or groups of parties are involved in the dispute:

·1. The receivers of Military Savings and Loan Association, Inc. (Military), and of First Guarantee Savings and Loan Association, Inc. (First Guarantee). Military and First Guarantee claim that the funds transferred by them to SFIC were held by it in a fiduciary capacity, and therefore, should be returned to them.

2. The receivers of Commercial Savings and Loan Company, Monumental City Savings and Loan Association, Inc. and First Fidelity Savings and Loan Association, Inc. These receivers claim that the funds constitute general assets of SFIC and are, therefore, available for distribution to all of the insolvent associations which are creditors of the insurance company.

3. The receiver of Security Financial Insurance Company. The SFIC receiver states that he is essentially a stakeholder of the funds in dispute, but supports the position of his accountant that the funds had been sufficiently segregated to identify them as "Trust Funds."

At various times prior to the insolvency of SFIC, Military and First Guarantee, and a number of other associations not involved in this case, had transferred substantial amounts of money to the insurance company pursuant to the terms of similar, but separate, formal agreements. Based on the provisions of the agreements, Military and First Guarantee filed separate proceedings to secure the refund of their monies. By order of the Circuit Court for Baltimore City, the two cases were consolidated and were considered as claims duly filed in the receivership proceeding of SFIC. The matter was referred to an auditor (John P. O'Ferrall). After taking testimony, the auditor filed a report stating that the funds deposited by Military and First Guarantee could be traced and identified; and that Military and First Guarantee were entitled to have the monies so transferred returned upon the liquidation of the assets comprising the fund.

The receivers of Commercial, Monumental and First Fidelity excepted to the report. The Circuit Court for Baltimore City (Cardin, J.) overruled the exceptions and ratified the auditor's report. The three receivers appealed.

Under the agreements, payments were made by Military and First Guarantee into a "Trust Fund" to be held by Security Financial Insurance Corporation as "Trustee." The "Trust Agreements" establishing each fund called for an initial payment by the associations of an amount equal to the 5% of the then outstanding shareholders' savings accounts on deposit with the association into the "Trust Fund." The agreements required further payments, computed on a monthly basis, of amounts sufficient to maintain the ratio of 5% of the outstanding shareholders' savings accounts on deposit with the associations.

The purpose of the funds, as stated in both agreements, was "to establish a revocable trust of certain funds and/or securities to better indemnify its [the transferor association's] savings account shareholders and to also increase the liquidity of said association and to set up a reserve fund for contingencies." Nevertheless, SFIC as "Trustee" was given the power and authority under the agreements to "reinvest" the monies in the fund, in its sole discretion, restricted only to the type

of investments which the associations themselves could make under the law.[1]

"Supplemental Agreements" further provided that the associations were to be paid an amount of interest on the funds deposited with SFIC equal to 3% per annum, with the sole discretion abiding in the "Trustee" to raise or lower the interest rate.

Under the agreements, Military and First Guarantee were not permitted to withdraw their contributions, in whole or in part, except in the event that their available cash, or withdrawable funds in bank or available from banks, was reduced to an amount equal to less than 1% of the then outstanding shareholders' accounts; in such event, each association could withdraw only an amount necessary to raise its available cash to an amount equal to 1% of its then outstanding shareholders' accounts. This limited right of withdrawal could be exercised only once in any given six-month period. Moreover, in the event of such withdrawal, the association was required to pledge and post with the "Trustee," mortgages and other securities equal in value to the amount of the cash withdrawal.

Article Fifth of the agreements provided for termination of the "Trusts" upon termination of the insurance policies to which the agreements referred. However, SFIC was given absolute discretion to retain, after such termination, any amount of cash or securities deposited under the agreements to protect SFIC (as insurer or as "Trustee") against continuing liability either under the insurance policy or under the "Trust Agreements."

---

1. Even this restriction is somewhat ambiguous in that Article Sixth of the agreements expressly authorizes and empowers the "Trustee," in its sole and absolute discretion: "A. To invest, reinvest and change the investments of any trust and to keep the same invested in such stocks, common or preferred, bonds, mortgages, ground rents or other property, real or personal, as it may consider advisable or proper, without being restricted as to the character of any investment by any statute or rule of law or court governing the investment of trust funds. B. To hold investments in the name of a nominee or nominees or in the corporate name of the Corporate Trustee without disclosing its fiduciary capacity, or to retain the same in unregistered form, payable to bearer. * * * "

Any amount not used for payment of reserved claims or losses was to be "returned forthwith by the said Trustee" to Military and First Guarantee. Although the agreements made no specific provision for the segregation of the funds of the associations, SFIC maintained special trust accounts in local banks and kept separate accounts, relating to the funds, in its books and records. The "Trustee" agreed to "account for all funds, securities or other property, real or personal" received under the agreements "at such reasonable times as may be requested" by the associations.

Auditor O'Ferrall found it unnecessary to determine the nature of the "Trust Agreements" in question. His articulate opinion states:

> "The facts as developed in the proceedings before the Auditor indicates [sic] that regardless of the nature of the trust agreements, Security Financial treated these funds as trust funds throughout its entire existence and segregated them from its general assets in all of its accounting. * * * Whether the trust, itself, could be determined as a valid trust or not does not affect the claims of First Guarantee and Military. *The fact that the monies were segregated and can be traced shows that Security Fniancial treated the funds deposited as the property of First Guarantee and Military rather than one or more of its general assets.* To permit the claims of First Guarantee and Military to prevail in these proceedings, it is only necessary to find that Security Financial *received the deposits* of First Guarantee and Military and that Security Financial *still has in its possession* the deposit of First Guarantee & Military. * * *." (Emphasis supplied).

While we cannot agree with the Auditor's overly-broad conclusion that the mere segregation of the funds plus their traceability will permit an original owner of property to recover it from his insolvent transferee, we affirm the orders of the Circuit Court for Baltimore City, denying the appellants' exceptions to the Auditor's report.

## (1)

Identification of the trust property, either in its original or altered form, is essential to its recovery by the *cestui que trust. County Comm'rs of Frederick County v. Page,* 163 Md. 619, 164 Atl. 182 (1932). But a right of recapture in the original owner cannot exist until he shows that he still retains an interest in the property or fund. The initial question in this case is whether Military and Financial Guarantee retained interests in the funds transferred to SFIC or whether SFIC was entitled to both the control and the equitable benefit of them. The appellants, in considering the latter proposition, argue that the funds were, in reality, transferred to SFIC as *loans* and not in trust, and that Military and First Guarantee and SFIC stand, therefore, in a debtor-creditor relationship. The legal distinction between debt and trust is often an important one. As Scott, *The Law of Trusts,* section 12.6 (2d Ed. 1956) points out:

> "The distinction between a trust of money and a debt is of importance where one person pays over money to another who becomes insolvent. If the money is held in trust, and the trustee becomes insolvent, the beneficiary is entitled to the money if he can identify it in the hands of the trustee or if he can trace it into a product. He need not share it with the creditors of the trustee, and if the trustee is bankrupt, the money does not become part of the estate to be distributed to creditors."

If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. Where the language of the parties does not clearly show their intention, all the circumstances must be considered in order to determine whether a trust or a debt was intended. *Restatement of Trusts,* section 12 (comment g); *Killen v. Houser,* 239 Md. 79, 210 A. 2d 527 (1965); *Dunlop Sand & Gravel Corp. v. Hospelhorn,* 172 Md. 279, 191 Atl. 701 (1937); *Doty v. Ghinger,* 166 Md. 426, 171 Atl. 40 (1934).

The "Trust Agreements" outlined above represent the principal manifestation of the intention of the parties with respect to the funds transferred to SFIC. An agreement substantially

identical to those before us has been considered by the State Attorney General in ruling that deposits by savings and loan associations to the SFIC "Trust Fund" were not authorized, under Maryland laws limiting the investments of associations, either as investments or as a portion of the required reserves. 46 Ops. Att'y Gen. 30 (1961). It was noted in that opinion that some of the provisions of the agreement "cast doubts as to whether it constitutes, in fact, a trust relationship" and that the transfer of funds under the agreement had many of the elements of "an unsecured loan" to SFIC "at an interest rate to be fixed at the whim of the borrower, for such term as the borrower deems appropriate, for the sole benefit of the borrower." The Attorney General, however, expressly refrained from ruling on the nature of the agreement or the parties' rights under it, and did not say that a debtor-creditor relationship existed. As viewed by the Attorney General, the transfer was illegal because the associations received no security in return for the funds placed with SFIC.

We believe the "Trust Agreements" strongly evidence an intention on the part of the appellee-associations and SFIC to create an express trust. The agreements provided that the funds were to be held in trust by SFIC "for the benefit" of the associations, and that the purpose of the "trusts" was "to better indemnify the savings account shareholders and to also increase the liquidity of said Association, and to set up a reserve fund for contingencies." The agreements recite that SFIC is "mindful of its duty to the shareholders" of the associations and will execute the "trusts" "with all due fidelity." Military and First Guarantee had the right to demand and receive accountings at reasonable times. Significantly, the agreements also stated that any funds remaining in the hands of SFIC at the termination of the "trusts" were to be "returned forthwith" to Military and First Guarantee. In addition, the actions of SFIC with respect to the funds, in segregating them from the general assets of the insurance company, are strikingly consistent with an intention to establish and maintain the funds in trust.

It is true, as noted in the Auditor's report, that "[t]here are provisions in the agreement that would permit Security Fi-

nancial to treat the trust funds in a very loose manner," and that SFIC was "a possible beneficiary" in the event that company became subject to continuing liability under its insurance coverage or its agreements with the associations. Under the agreements it was also possible that SFIC might pay interest on the funds deposited with it.

None of these factors, either separately or taken together, is sufficient for us to say the parties in this case did not contemplate a fiduciary relationship. SFIC's broad discretion over the use and investment of the funds is limited by its covenants to execute its powers "with all due fidelity" and "for the benefit" of the associations' shareholders; indeed, investing a trustee with broad powers and discretion to change the investments of a trust is a common and often desirable provision included in trust agreements. The possibility that SFIC might become a beneficiary of the trust upon default by the associations in no sense destroys the trust relationship until the contingency occurs; for not until that time would the legal *and equitable* interests merge in the same entity. The agreement to pay interest, although often strong evidence that the parties intended to create a debt, *Dunlop Sand & Gravel Corp. v. Hospelhorn, supra,* does not so indicate in this case. Interest was not payable at a fixed rate, but could be raised or lowered at SFIC's sole option. This provision is hardly indicative that the parties intended a bona fide loan of money.

In short, we think it is clear that the parties intended to create a valid express trust.

### (2)

The appellants suggest, however, that the parties' intention must fail because one of the essential elements necessary for a valid trust is lacking. Judge Digges, for the Court, in *Sieling v. Sieling,* 151 Md. 536, 135 Atl. 376 (1926) reviewed the requisites for a valid express trust:

> "Generally speaking, in order to create a valid trust, three circumstances must concur: First, a definite subject matter within the disposition of the settlor; second, *a lawful definite object to which the subject matter is to be devoted;* third, clear and unequivocal

words or acts devoting the subject matter to the objects of the trust." (Emphasis supplied).

It is argued that the agreements in question lacked a lawful trust objective in that the transfer of funds from Military and First Guarantee was an illegal investment under Maryland Code (1966 Repl. Vol.), Article 23, sections 150, 161EE, and 161Z,[2] as indicated in 46 Ops. Att'y Gen., *supra*. In our view, it would make no difference to our decision if the intended trust were invalid. We assume, without deciding, that the transfers

---

2. Article 23, § 150 limits such investments to cash, fixtures, or loans or hypothecated stock of such associations, judgments or decrees for payment of money received by courts in this State, mortgages on real or leasehold estate situate in this State, ground rents issuing from real estate located in this State, bonds of this State and bonds or other obligations of, or guaranteed as to principal and/or interest by, the United States.

Section 161Z of Article 23 broadens the investment powers of associations to some degree by providing: "Investments of Associations. (a) *Power to invest*. In addition to the investments permitted to be made by associations organized under the laws of this State, pursuant to Section 150 of this Article, every association shall have power to invest: (1) In such real estate as may be or reasonably anticipated to be necessary or convenient for the transaction of its business, and this shall include the power to derive revenue or otherwise, from any portion of such real estate; (2) In real estate purchased at auction sale, public or private, judicial or otherwise, upon which the association has lien or claim, legal or equitable; (3) In real estate accepted by the association in satisfaction of any obligation; (4) In real estate acquired by the association in exchange for real estate owned by the association; (5) In real estate acquired by the association in connection with salvaging the value of property owned by the association; (6) In chattels and equipment necessary to conduct its business; (7) By making loans to members of cooperative housing projects secured by the assignment of their interest or equity in a unit of such project, notwithstanding the fact that such project as a whole may be subject to a prior lien, and notwithstanding any other provisions of this Act; (8) With banks insured by the Federal Deposit Insurance Corporation. * * *."

Article 23, § 161 EE requires that each association maintain a reserve in a total minimum required amount equal to six percent of the aggregate withdrawal value of the association's free share accounts, "to be used solely for the purpose of absorbing losses."

of funds violated a statute designed to prevent unsafe investments by savings and loan associations, and that the intended trusts, therefore, are void *ab initio.*

The fact that an intended express trust fails because its purpose is unauthorized or illegal, however, does not change the circumstances surrounding the transfer. If these circumstances raise an inference, unrebutted by the facts, that the party making the transfer did not intend to give the transferee the beneficial interest in the property, equity courts may act to prevent the transferee from obtaining this interest by declaring a resulting trust. *Siemiesz v. Amend,* 237 Md. 438, 206 A. 2d 723 (1964) ; *Sands v. Church of the Ascension and Prince of Peace,* 181 Md. 536, 30 A. 2d 771 (1943) ; *Rosenthal v. Miller,* 148 Md. 226, 129 Atl. 28 (1925) ; *Schwarz v. United States,* 191 F. 2d 618 (4 Cir. 1951) ; 4 Pomeroy, *Equity Jurisprudence,* sec. 1031 (5th Ed. 1941) ; Bogart, *The Law of Trusts and Trustees,* sec. 454 (2d Ed. 1964). We have already found that this requirement is met in this case. There was no intention to create a debt, and SFIC was not intended to have an equitable interest in the funds.

In addition, for a resulting trust to arise upon the failure of an intended trust for illegality, the equitable policy which carries out the intention of the transferor must outweigh the policy against giving relief to a party to an illegal transaction. *Restatement of Trusts* 2d, sec. 422; *Chandler v. United States,* 177 F. Supp. 565 (D. N. H. 1959) ; *Thompson v. Steinkamp,* 120 Mont. 475, 187 P. 2d 1018 (1947). In our opinion, the usual reluctance of an equity court to relieve a party from burdens of an illegal transaction does not prevent a resulting trust from arising in this case. To hold otherwise would be inconsistent with the declared policy of this State, justifying its regulation of the savings and loan business.

The State's strict regulation of savings and loan associations, including limitations on their investment practices, is grounded in a determination by the General Assembly that:

> "The savings and loan business * * * has become so integrated with the financial institutions of this State and *is so important as a method of promoting home ownership and thrift,* that such business *is affected*

> *with a public interest* and shall be supervised as a
> business *affecting the economic security and general*
> *welfare* of the people of this State; * * *" Maryland
> Code, Article 23, sec. 161A (1966 Repl. Vol.) (Em-
> phasis supplied).

The principal beneficiaries of the regulations are, of course, those members of the public who place their savings and their trust in the associations. It is this group which is both the one most uninformed in regard to the nature of the associations' operations and the one most likely to suffer detriment from a misuse or abuse of corporate powers. Cf. *First Continental Savings & Loan Ass'n v. Directors,* 229 Md. 293, 310, 183 A. 2d 347 (1962). It is this group—the shareholders and creditors of Military and First Guarantee—who will bear the loss if SFIC were permitted to retain the benefit of the funds transferred to it. SFIC, on the other hand, is unprotected by any statutory policy; and if the agreements contain provisions which are beyond the lawful powers of the associations, SFIC is chargeable with knowledge of the illegality. *County Comm'rs of Frederick County v. Page, supra.*

We think these policy considerations would justify an equity decree returning the funds to Military and First Guarantee even assuming the parties intended the transfer to be a loan and not a trust. As a loan, the transfer would be unsecured, and therefore, also illegal under the ruling of the Attorney General. To protect the shareholders and creditors of the "lenders," an equity court could properly restore the parties to *statu quo* through the application of a constructive trust,[3] *County Comm'rs of Frederick County v. Page, supra,* despite the usual reluctance of the courts to change the status of parties to an illegal transaction.

> *Orders affirmed, the costs to be paid*
> *by the appellants.*

---

**3.** We approve the helpful distinction between constructive and resulting trusts noted by Professor Bogart, *The Law of Trusts and Trustees,* § 451. Constructive trusts include "all trusts which are based on breach of contractual or fiduciary obligation, fraud or other wrongdoing"; resulting trusts include "only those where the trust is established upon the basis of actual or presumed intention of the settlor."