**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION, as Receiv-er for San Marino Savings and Loan Association**

v.

**QUALITY INNS, INC., et al.**

Civ. No. Y–86–1866.

United States District Court,
D. Maryland.

Nov. 30, 1987.

David F. Albright, Harry M. Rifkin, and Terri L. Reicher, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Federal Savings and Loan Insurance Corporation ("FSLIC"), in its capacity as federally-appointed receiver for San Marino Savings and Loan Association, filed suit against Quality Inns, Inc., Quality Hotels and Resorts, Inc., and Quality Inns International, Inc. Plaintiff asserts claims for breach of fiduciary duty to San Marino, conversion of San Marino's funds, and breach of an escrow agreement to which San Marino was a third-party beneficiary. The matter was presented to this Court for trial without a jury. Having heard the evidence and the arguments of counsel, the Court makes the findings of fact and conclusions of law stated herein, in accordance with Rule 52, Fed.R.Civ.P., whether or not specifically identified as such.

## I. FINDINGS OF FACT

In 1983, American Resort Services, Inc. ("ARS") undertook the construction of Silver Creek Ski Resort in Slatyfork, West Virginia. On July 11, 1983, ARS entered into a Memorandum of Understanding with Quality Hotels and Resorts, Inc. ("Quality Hotels"), wherein Quality Hotels agreed to provide design and purchasing assistance to ARS for the ski resort. The agreement designated Quality Hotels as managing agent of the project and provided that it would be paid $70,000 for design and review, and cost plus 5% for purchasing. Plaintiff's Exhibit 1. Although Quality and ARS never executed a final management contract or technical services contract, Plaintiff's Exhibits 7 and 5, Quality conducted itself as if these agreements had been signed. *See* Plaintiff's Exhibit 37.

On August 2, 1983, ARS secured a $27,000,000 construction loan from San Marino Savings and Loan Association, an institution chartered by the state of California.[1]

Daniel M. Litt, Washington, D.C., for plaintiff.

---

1. Barry Conrad, President and Chief Executive Officer of Quality Inns, Inc., introduced ARS

The loan was evidenced by a promissory note from ARS, and further secured by a first deed of trust on the real property and improvements which were to be constructed at the ski resort. The improvements included all buildings, furniture, fixtures, machinery, equipment and tangible personal property located on or attached to the ski resort. Plaintiff's Exhibits 118, 119. The promissory note provided that the:

> Borrower shall have the right to request disbursement of principal for the following purposes: payment of loan origination and commitment fees; ... land acquisition costs ...; ... loan settlement costs ...; ... accrued interest on the loan; and the general development (including construction, promotion and marketing) of the Silver Creek Ski Resort, pursuant to and in accordance with plans, specifications, draw schedules and that certain "Schedule of Values" heretofore submitted to Lender.

Plaintiff's Exhibit 118 at 2. Other than funds for pre-opening expenses, the loan was not intended to cover the ski resort's operating expenses.

The same day San Marino and ARS executed the loan documents, ARS and Quality Hotels entered into an agreement granting Quality Hotels a profit participation in the ski resort in return for certain services. Quality Hotels was to receive 15% of the net pre-tax profits of Phases I and II of the project for, *inter alia,* "assistance on behalf of the construction lender in administration of the construction loan as construction progresses...." Plaintiff's Exhibits 9, 26 at 3. One week later, Quality entered into an agreement with San Marino to "inspect, photograph, validate materials on site and approve construction progress for San Marino" for a fee of $75,000. Plaintiff's Exhibit 100. Barry Conrad, President and Chief Executive Officer of Quality Inns, Inc., described this as a "servicing and inspection fee". Plaintiff's Exhibit 2. Quality subsequently received the $75,000 fee from San Marino. Plaintiff's Exhibit 32. As additional compensation for its role

as construction inspector, ARS and San Marino made provision in the loan for a $160,000 payment to Quality for "Quality Inn Supervision." Plaintiff's Exhibit 89. By late February 1984, defendants had received the entire loan supervision fee.

Beginning August 4, 1983, Quality assigned a Project Manager to inspect and photograph the progress of construction at the ski resort on behalf of San Marino. The first inspection was performed by Charles Hill, Quality's Vice President for Engineering, and Edward Bogdan succeeded Hill as Project Manager. These men sent inspection reports to San Marino to confirm the status of construction.

In addition, the Project Manager reviewed and approved loan disbursement requests submitted to San Marino by ARS or the general contractor. Bogdan testified that ARS first presented the disbursement requests to him because San Marino required all requests to be approved by Quality. Bogdan analyzed each request by line item and approved disbursement of funds for completed work. He then forwarded the draw requests to San Marino. San Marino required verification of disbursement requests against work-in-progress. Plaintiff's Exhibit 63. Bogdan admitted that he evaluated the draw requests and approved them on behalf of San Marino, and Hill testified that part of Quality's fee was for approval of loan withdrawals.

In the fall of 1983, Quality's staff designed and estimated the cost of furnishing the ski resort condominiums at $788,144.87. Plaintiff's Exhibit 67. Quality was aware these furnishings were essential to the sale of condominium units and the ultimate rental of units as a condominium hotel under the "Quality Royale" franchise. Plaintiff's Exhibit 191 at 95–96. Defendants required the furnishings to be of superior quality to merit the "Royale" rating.

The furniture had to be ordered several months before its desired delivery date. To assure the availability of funds to pay

---

executives to Robert Rippe, Senior Vice President at San Marino. Plaintiff's Exhibit 191 at 12. San Marino agreed to make the loan to

ARS on the condition that Quality manage the project. Plaintiff's Exhibit 190 at 13.

for these furnishings,[2] Quality and ARS decided that ARS would request, and Quality would approve, a disbursement from the loan funds allocated for furniture and fixtures before the furnishings were actually purchased. Plaintiff's Exhibit 190 at 56–57. The parties further agreed that the loan disbursement would be held in escrow pending order and delivery of the furniture. Plaintiff's Exhibits 190 at 59–60, 191 at 26.

Quality's Project Manager Edward Bodgan was instructed by his superiors to approve the disbursement of all $719,732 remaining in the loan under the line item, "09–016 Furniture and Fixtures." Plaintiff's Exhibit 189, Vol. II at 94. Other Quality employees were responsible for ordering the furniture and fixtures, and Bogdan had no first-hand knowledge that any items had been ordered. He understood that the money would be used to purchase furniture for the condominiums. Bogdan was under the impression that after San Marino disbursed the money, Quality would use it to pay the vendors from whom Quality would order furniture and fixtures. Plaintiff's Exhibit 189, Vol. I at 64.

On January 31, 1984, ARS requested a total disbursement of $1,205,242 from the loan. Edward Bodgan modified and then approved the request on February 8, 1984, asking for a total withdrawal of $1,021,480 (the "Seventh Draw"). Plaintiff's Exhibit 89. Included within the total draw was a request for disbursement of all remaining funds allocated under line item "09–016 Furniture and Fixtures" in the amount of $719,732. The construction loan allocated $900,000 for furniture and fixtures. As of January 31, 1984, $180,268 had been disbursed by San Marino pursuant to previous draw requests approved by Quality. After disbursement of the Seventh Draw, the loan would contain no funds for the purchase of furniture and fixtures.

On February 22, 1984, San Marino wire transferred $1,021,480 to savings Account No. 88–3871–6 in Suburban Bank of Bethesda, Maryland. Defendants' Exhibit 17. The account was in the name of "American Resort Services, Inc., d/b/a Quality Royale Resort Silver Creek, c/o Quality Inns, Inc." Defendants' Exhibit 20. Four persons were authorized by ARS to act as agents with regard to the account, and signatures of any two agents were required to make transactions in the account. The signatories were all officers and/or employees of Quality Inns, Inc. or its parent company, Manor Care, Inc. Plaintiff's Exhibits 143, 145.

Neither Leonard Jackson, Vice President of ARS, nor John Kruse, Chairman and Chief Executive Officer of ARS, was aware that San Marino would disburse the money to an account under Quality's control. All previous draws had been disbursed to ARS. When Kruse learned Quality had received the money, he immediately told defendants to forward the funds to ARS. Plaintiff's Exhibit 191 at 28. Barry Conrad was out of the country, and Richard Robbins, then Executive Vice President of Quality Inns, Inc., refused to transfer money without Conrad's approval. Jackson and Kruse were furious. Plaintiff's Exhibit 190 at 72. Kruse testified that he was not aware the funds had been placed in an account under the name of ARS, otherwise he would have instituted a corporate resolution to enable ARS to control the funds. Plaintiff's Exhibit 191 at 80.

After ARS had an opportunity to negotiate with Barry Conrad, Brian MacArthur, Controller for Hotel Operations for Quality Inns, Inc., was instructed by ARS to transfer $358,509[3] to an ARS account in South Carolina and "to deposit in an interest bearing escrow account the amount of $719,732." Plaintiff's Exhibit 27. Apparently, ARS was not aware that if $358,509 were sent to them, less than $719,732 would remain from the total draw request for furnishings. Either Barry Conrad or

---

2. Barry Conrad was concerned about San Marino's financial condition. Plaintiff's Exhibits 190 at 45; 191 at 23.

3. This figure represents the total of all line item disbursements originally requested by ARS under the Seventh Draw, excluding "Furniture and Fixtures" and "Quality Inn Supervision." *See* Plaintiff's Exhibit 89.

another Quality officer decided to send the requested monies to ARS, allocate to Quality the $25,000 portion of the loan supervision fee that had been approved under the Seventh Draw, and deposit only $637,971 into an escrow fund. *Id.*

Brian MacArthur testified that he considered the fund an escrow account, and he knew the money was to be held for furniture and fixtures. Charles Hill testified that he was aware Quality had received funds to be held in escrow. As further confirmation of the agreement to escrow $719,732 for the purchase of furniture and fixtures, Richard Robbins sent a memorandum to David Bernard, then Vice President of Finance for Quality Inns, Inc., confirming the receipt and disposition of the Seventh Draw: "As related by B. Conrad telephonically today [February 24, 1984]: 1) $719,732 to be held in escrow for FF & E...." Plaintiff's Exhibit 29.

The parties stipulated that the loan proceeds from the Seventh Draw were not used to purchase furniture for the condominium rooms at the Silver Creek Ski Resort. The evidence revealed that defendants drew down the funds to reimburse themselves for unpaid invoices and operating expenses allegedly owed by ARS. On April 18, 1984, Barry Conrad wrote to Leonard Jackson that Conrad previously authorized Quality's personnel to withdraw $200,000 from the "escrow fund", and he was currently authorizing them to withdraw an additional $247,824.16 to pay Quality for past due invoices. Plaintiff's Exhibit 45. These withdrawals were not approved by ARS and were made without notice to or authorization from San Marino. Plaintiff's Exhibits 190 at 79; 191 at 29–31. On May 7, Conrad again informed Jackson that he had authorized withdrawal from the "escrow fund" of an additional $183,371.67 to pay past due invoices. Plaintiff's Exhibit 52. Again, the withdrawal was not authorized by either ARS or San Marino.[4] Plaintiff's Exhibits 190 at 93; 191 at 43.

On May 31, 1984, ARS, through its attorneys, demanded that Quality return the money that had been deposited into the escrow fund. Plaintiff's Exhibit 107.

By this point in time, the Federal Home Loan Bank Board had appointed FSLIC conservator of San Marino.[5] FSLIC demanded an accounting from Quality of the $719,732 disbursed for furniture and fixtures. Plaintiff's Exhibit 47. Defendants responded by sending to FSLIC a copy of Conrad's April 18, 1984 letter to Jackson. Plaintiff's Exhibit 49. On May 4, 1984, James DeFrancia, retained by FSLIC as consultant on real estate matters, requested that ARS provide evidence that money was returned to the furniture and fixtures escrow fund. Plaintiff's Exhibit 48. DeFrancia testified that he sent this demand to ARS because Quality claimed ARS had given permission for Quality to use the money to pay its expenses, and ARS claimed Quality had simply taken the money. DeFrancia wanted ARS and Quality to settle that dispute among themselves and return the money to the escrow fund. When the money was not replaced, FSLIC demanded that Quality return the escrow funds, including interest, because defendants had not used the money to purchase furniture and fixtures. Plaintiff's Exhibit 96. Defendants refused.

Quality Hotels ceased on-site management of Silver Creek Ski Resort in April 1984, and defendants withdrew from the project entirely the following fall. On December 6, 1984, FSLIC was appointed receiver of San Marino.

On October 25, 1985, Silver Creek Ski Resort was foreclosed, and FSLIC purchased the property for $17,100,000. Plaintiff instituted this action on April 17, 1986 to recover the $719,732 that FSLIC claims defendants misappropriated.

## II. DISCUSSION

When FSLIC assumed control of San Marino, it succeeded to all the rights, titles,

---

4. Barry Conrad testified that Leonard Jackson authorized Quality to draw down the Furniture and Fixtures money to reimburse themselves for operating expenses. This Court does not so find.

5. FSLIC was named conservator on February 3, 1984.

powers and privileges of the savings and loan association. 12 U.S.C. § 1729(c)(1)(B)(i)(II); 12 C.F.R. § 569a.4. FSLIC claims that defendants breached their fiduciary duty as agents of San Marino, and converted San Marino's funds. In addition, FSLIC alleges that San Marino was a third-party beneficiary of an oral contract between ARS and Quality to escrow $719,732 to purchase furnishings for the ski resort condominiums, and that Quality breached this contract.

### A. *The Agency Relationship*

An agency relationship is the "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1). *See Schear v. Motel Management Corp.,* 61 Md.App. 670, 487 A.2d 1240, 1248 (1985). The primary duty of an agent is loyalty to the interest of his principal. *King v. Bankerd,* 303 Md. 98, 492 A.2d 608, 613 (1985).

As the party asserting the agency relationship, FSLIC bears the burden of proving its existence and scope. *Borg–Warner Acceptance Corp. v. Rossi,* 365 F.Supp. 56, 59 (D.Md.1972), *aff'd,* 485 F.2d 1388 (4th Cir.1973). The existence of an agency relationship is determined by the relations of the parties as they exist by agreements or acts, and the ultimate question is one of intention. *McLaughlin v. Copeland,* 435 F.Supp. 513, 533 (D.Md. 1977); *Ramsburg v. Sykes,* 221 Md. 438, 158 A.2d 106, 108 (1960). The agency relationship may be created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Restatement (Second) of Agency § 26.

The evidence clearly established that defendants Quality Inns, Inc. and Quality Hotels and Resorts, Inc. served as San Marino's agents. Several defense witnesses testified that for all practical purposes, Quality Inns and Quality Hotels operate as the same entity, and this Court will consider them as one. For simplicity's sake, these two defendants will be referred to hereafter as "Quality." Whether Quality Inns International, Inc. acted as San Marino's agent is discussed *infra* in Section II(C).

The agency relationship between Quality and San Marino was established both by written agreement and by the parties' conduct. By letter from Barry Conrad to Robert Rippe, Senior Vice President of San Marino, Quality agreed to "inspect, photograph, validate materials on site and approve construction progress for San Marino," for which Quality received $75,000. Although the letter did not explicitly state that Quality would approve requests for disbursement from the construction loan, Quality's Project Managers at San Marino testified that they scrutinized and approved each and every draw request *on behalf of* San Marino. Additionally, a written agreement between ARS and Quality gave defendants a 15% profit participation in Silver Creek in return for, *inter alia,* its "assistance on behalf of the construction lender in administration of the construction loan as construction progresses." Thus Quality did more than inspect the Silver Creek site to assure that materials were in proper order and construction progressed smoothly. Defendants also consented to verify on behalf of San Marino each draw request against actual work in progress, so the lender could be certain that loan proceeds were being disbursed for appropriate purposes.

In carrying out its duties on behalf of San Marino, Quality submitted to San Marino's control over the form and manner of defendants' reports to San Marino. Quality was directed to use specific procedures and forms for its inspection reports, Plaintiff's Exhibits 61 and 81, and San Marino provided vouchers containing line-item breakdowns upon which defendants' Project Manager based his approval or disapproval of disbursement requests. *See, e.g.,* Plaintiff's Exhibit 89. By letter from Edward Norris, Vice President of San Marino, to Leonard Jackson with a copy to

Barry Conrad, San Marino instructed both ARS and Quality that no draw request would be funded without prior verification and approval by Quality's inspector. Mr. Norris further required Quality's inspector to approve prior vouchers, originally submitted without Quality's signature, before San Marino would disburse the requested monies. Plaintiff's Exhibit 63. Clearly San Marino relied on Quality's approval of a draw request before disbursing loan proceeds.

When ARS submitted the draw request at issue in this case, the Seventh Draw, ARS included a detailed breakdown of how the money would be spent. These supporting materials indicated that the funds requested for Furniture and Fixtures would be used solely to purchase furnishings for the condominium rooms. Plaintiff's Exhibit 114. As San Marino's agent, Quality owed a duty of loyalty to San Marino in approving or disapproving draw requests.[6] By approving the Seventh Draw, Quality explicitly represented to San Marino that the progress of Silver Creek's development justified the disbursement of funds to pay for the items designated on the voucher.

If the funds had been disbursed directly to ARS, ARS would have been responsible for assuring that the Furniture and Fixtures money from the Seventh Draw was spent on furnishings for the condominium rooms. But Quality directed that the Seventh Draw be disbursed to both ARS *and* Quality and wired to an account controlled by Quality employees. Plaintiff's Exhibit 89. Because Quality controlled the funds after disbursement, defendants owed a duty to San Marino to apply the funds to their designated purposes. This obligation stemmed from Quality's duty as San Marino's agent to approve particular disbursements only if approval would be in San Marino's interest as the secured lender.

Rather than use the money disbursed for Furniture and Fixtures to furnish the condominium rooms, Quality drew down the funds to pay operating and other expenses that ARS allegedly owed to Quality. Whether ARS actually owed money to defendants is irrelevant. The important point is that defendants owed a duty to San Marino to see that those monies purchased furnishings for the condominiums, and Quality breached its duty to San Marino by using the money to pay itself. "An agent's duty is not only to act solely for the benefit of the principal in matters entrusted to him, but also to take no unfair advantage of his position." Restatement (Second) of Agency § 387, comment b. Quality knew San Marino would rely on defendants' approval of the Seventh Draw in agreeing to disburse the requested funds, and Quality knew it controlled the account in Bethesda, Maryland to which the funds would be wired. Defendants took unfair advantage of their position as San Marino's agent in appropriating the loan proceeds to their own use.

It is recognized that an agent is subject to liability for loss caused to the principal by the agent's breach of duty. Restatement (Second) of Agency § 401. If Quality had applied the loan proceeds to furnishing the condominium rooms, the furnishings would have increased the value of the "improvements" to the ski resort securing San Marino's loan and, ultimately, the value of the property purchased by FSLIC at the foreclosure sale. *See* Plaintiff's Exhibit 118 at 2. By breaching its duty to San Marino, Quality caused a loss at least commensurate with the dollar value of furnishings the loan proceeds would have purchased.

FSLIC insists that defendants misused $719,732. In reality, however, only $637,971 from the Seventh Draw was available to purchase furniture and fixtures for the condominiums. Under the Seventh Draw, San Marino wired $1,021,480 to an account in Bethesda, Maryland. Of that sum, defendants were entitled to withdraw $25,-

---

6. "The agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." Restatement (Second) of Agency § 13, comment a.

000, the portion of their loan supervision fee which had been requested under the Seventh Draw. In addition, defendants sent $358,509 to ARS. That left $637,971 which defendants should have spent on furnishings for the condominiums, rather than on their own expenses. This amount serves as the basis for determining defendants' liability to FSLIC.

■ Quality contends that plaintiff suffered no actual loss because defendants spent at least $305,000 for furniture, fixtures and equipment for the ski resort, Defendants' Exhibit 116, and $300,000 worth of furniture was eventually placed in the condominium rooms, Defendant's Exhibit 74. Defendants' contention lacks merit. The items listed in Defendants' Exhibit 116 include ski equipment, restaurant equipment and other miscellaneous goods purchased at unspecified times, but not purchases of furniture and fixtures for the condominiums, for which the money requested under the Seventh Draw was specifically designated. See Plaintiff's Exhibit 114. Additionally, money had already been disbursed for furniture and fixtures under previous draws. Defendants have not demonstrated that they were entitled to reimburse themselves from money procured under the Seventh Draw for items purchased for the ski resort.

As to the $300,000 of furniture subsequently placed in the condominiums, Quality had no role in either arranging for its purchase and delivery, or in paying for it. ARS eventually made arrangements for furniture delivery because Quality refused to utilize the funds obtained under the Seventh Draw to purchase furnishings. The fact that ARS eventually supplied some furniture for the condominiums does not lessen the injury caused when Quality misappropriated money designated for furnishings.

■ A fiduciary is liable not only for losses caused by a breach of duty, but also for simple interest at the legal rate running from the time of the breach. Brink v. DaLesio, 667 F.2d 420, 429 (4th Cir.1981). FSLIC contends that defendants are chargeable with compound interest because

they wrongfully utilized the furniture funds in their business by repaying themselves for operating expenses that were due, if at all, from ARS. A trustee would be chargeable with compound interest under such circumstances. See Riggs v. Loweree, 189 Md. 437, 56 A.2d 152, 157 (1947); Restatement (Second) of Trusts § 207, comment d. But plaintiff has not shown that defendants were intended to be trustees with respect to the furniture monies designated under the Seventh Draw. See Levin v. Security Financial Ins. Corp., 246 Md. 712, 230 A.2d 93, 96 (1967); Restatement (Second) of Trusts § 2, comment g. In addition, a basic requirement of a trust is that it be titled in the name of the trustee. Restatement (Second) of Trusts § 2, comment d. Although Quality may have controlled the savings account to which monies under the Seventh Draw were wired, the account was in the name of ARS. Accordingly, defendants will be charged with simple interest on the sum of $637,971 running from the date they began to misappropriate the funds.

This date is difficult to discern from the evidence. It occurred sometime between February 22, 1984, when San Marino wire transferred loan proceeds to the savings account under Quality's control, and April 18, 1984, when Barry Conrad notified Leonard Jackson that he had previously authorized Quality employees to withdraw money from the furniture and fixtures fund to pay defendants. For simplicity's sake, this Court will set the date at March 1, 1984. Thus, simple interest will be provided for from March 1, 1984 at a rate to be agreed upon by the parties within thirty (30) days. If the parties cannot resolve the matter within that time frame, this Court will do so.

B. *Release*

■ Following the foreclosure sale of Silver Creek Ski Resort, FSLIC and ARS executed mutual covenants not to sue. This release became effective in South Carolina where ARS was headquartered. Defendants contend that under South Carolina law, the release of one joint tort-

feasor releases all other joint tortfeasors. Because FSLIC released ARS, defendants contend, all claims against Quality should also be released.

Defendants are incorrect. First, South Carolina does not adhere to the old common law rule regarding joint tortfeasors. In *Bartholomew v. McCartha*, 255 S.C. 489, 179 S.E.2d 912, 914 (1971), the South Carolina Supreme Court adopted the "view that the release of one tortfeasor does not release others who wrongfully contributed to plaintiff's injuries unless this was the intention of the parties, or unless plaintiff has, in fact, received full compensation amounting to a satisfaction." *Accord Garner v. Wyeth Laboratories, Inc.*, 585 F.Supp. 189, 192 (D.S.C.1984). Second, ARS was not a joint tortfeasor with respect to defendants' breach of fiduciary duty to San Marino. Thus, the issue of release is not applicable.

Additionally, FSLIC has not received full satisfaction of its claims against Quality for misapplication of the furniture monies. By the time ARS filed for bankruptcy and the Silver Creek property was foreclosed, San Marino's loan to ARS had increased to $38 million. The foreclosure sale at $17 million, resulting in a $21 million deficiency, did not compensate FSLIC for the injury caused when defendants misappropriated the money intended to purchase furniture for the ski resort.

#### C. *Quality Inns International, Inc.*

■ Quality Inns, Inc., Quality Hotels and Resorts, Inc., and Quality Inns International, Inc. are three separate corporate entities. FSLIC has consistently referred to all three organizations collectively as "Quality" and assumed that all three are equally liable to plaintiff. However, "the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity." *Dixon v. Process Corp.*, 38 Md.App. 644, 382 A.2d 893, 899 (1978).

Defendants acknowledged that Quality Inns and Quality Hotels operated as the same entity, thus they have been treated as one. The evidence did not show that Quali-

ty Inns International operated as the same organization, or that Quality Inns International undertook to act on behalf of San Marino, or that Quality Inns International played a significant role in either the relationship between defendants and San Marino, or the relationship between defendants and ARS. No fraud has been perpetrated by Quality Inns International, nor is there a paramount equity sufficient to enable this Court to ignore the separate corporate status of Quality Inns International. It cannot be held liable for the wrongdoings of the other two defendants.

### III. CONCLUSION

For all the foregoing reasons, defendants Quality Inns, Inc. and Quality Hotels and Resorts, Inc. breached their fiduciary duty as agents of San Marino Savings and Loan Association, and are liable to plaintiff FSLIC in the sum of $637,971 plus simple interest running from March 1, 1984. The parties will agree upon the interest rate to be charged, and so notify this Court within thirty (30) days. In the event the parties cannot agree within this time period, the Court will establish the appropriate interest chargeable against defendants.